IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL J. GAROFALO, | No. 06C003674 |
| Plaintiff, | **(CONSOLIDATED WITH 06C001372)** |
| vs. | |
| | Judge William T. Hart |
| VILLAGE OF HAZEL CREST; | |
| | Magistrate Judge Morton Denlow |
| Defendants. | |

**Combined Memorandum of Law in Support of Motion for Summary Judgment
and Motion to Dismiss Non-Title VII Counts**

The Village of Hazel Crest, Gary Jones, Robert Donaldson and Robert Palmer for their

combined memorandum of law in support of the Village's motion for summary judgment as to Title

VII and all defendants' Rule 12(b)(6) motion to dismiss the non-Title VII counts of the plaintiffs'

complaints, states as follows:

**Memorandum of Law in Support of Summary Judgment**

**Introduction**

In July 2005, the plaintiffs were four white sergeants with the Hazel Crest Police

Department. Claiming that they were "better qualified" than the black officer selected, they

allege they have suffered "reverse discrimination" when they were not chosen for the second of

two deputy chief positions that were open. Chief of Police Gary Jones, who is white, selected

Malcolm White, an African-American patrol officer, for one of the positions and Gary Gentzle, a

white sergeant for the other.

It is the Village's position that the applicable Illinois statute and village ordinance gave

Gary Jones complete discretion to make *his* selections for the positions of deputy chief, based

upon *his* assessment as to which officers would best be able to carry out *his* goals and objectives

for the operation of Hazel Crest Police Department. Neither Illinois law nor the village

ordinance required the chief to select the candidate with the "most education," the "longest tenure" or the highest score on a competitive exam. 65 ILCS 5/10-2.1-4. Unlike the provisions for new recruits or other ranks in the department[1], the law affords the chief the discretion to choose whomever he believes is the best person for the job, so long as the officer has at least five years with the department. *Id.*

To deprive Chief Jones of the discretion to choose those officers for the deputy chief positions whom he believed were best able to carry out his goals and objectives, would be contrary to the express language of the law and would defeat the purpose behind making the position an "exempt rank." It would subject every choice a chief makes for deputy, to second guessing by a court or jury, as there is sure to be some officer who feels he or she is "better qualified." As an exempt rank, Chief Jones could make his selection "from among any rank of sworn full-time officers," free from the strictures of the promotional processes prescribed for other ranks under the provisions of the Municipal Code relating to the Board of Fire and Police Commissioners. 65 ILCS 5/10-2.1 *et seq.* Because Gary Jones' selections complied in every respect with Illinois law and village ordinance, his discretion cannot be challenged here because the plaintiffs were disappointed that they were not chosen. Summary judgment should be entered in the village's favor.

### Factual Summary

The Village of Hazel Crest was a non-homerule community in 2001, when it adopted an ordinance pursuant to Illinois statute providing for the appointment of deputy chiefs of police by the chief of police. (DSOF ¶ 17) The statute, part of the Illinois Municipal Code relating to the Board of Fire and Police Commissioners, provides in pertinent part:

---

[1]E.g., 65 ILCS §5/10-2.1-6 (mandating a competitive examination for new police and fire applicants); §10-2.1-15 (providing for promotion based only upon merit, seniority and competitive examination)

2

The deputy chief position shall be an exempt rank immediately below that of Chief. The deputy chief may be appointed from any rank of sworn, full-time officers of the municipality's police department, but must have at least 5 years of full-time service as a police officer in that department. A deputy chief shall serve at the discretion of the Chief. . . (DSOF ¶ 5, 8)

The ordinance adopted by the village in 2001, tracks the statute nearly verbatim. (DSOF ¶ 6)

When the ordinance was adopted in 2001, the chief of police was Peter J. Fee. (DSOF ¶ 12) His selections for deputy chief, and thus the first individuals to hold the deputy chief positions in the history of the department, were Gary Jones and Richard Lenz. There was no selection process. (DSOF ¶ 13)

In April 2005, Robert Donaldson was elected village president or mayor of the Village of Hazel Crest.[2] (DSOF ¶ 20) Because of past differences he had with Robert Donaldson, Chief Fee decided to retire before Mr. Donaldson took office. (DSOF ¶ 26) Deputy Chief Richard Lenz retired within days of Chief Fee. (DSOF ¶ 27) The village manager appoints the chief of police in the Village of Hazel Crest. (DSOF ¶ 23, 30) Peter Fee recommended to Village Manager Robert Palmer, that Gary Jones be appointed chief of police. (DSOF ¶ 24, 28)

On April 22, 2005, Robert Palmer appointed Gary Jones "acting" chief of police. (DSOF ¶ 29) Filling the chief's position, resulted in two openings for deputy chief. (DSOF ¶ 31) Robert Donaldson and the newly elected trustees on the village board, were sworn in May 2005. (DSOF ¶ 21) ¶ On June 28, 2005, Robert Palmer appointed Gary Jones as chief of police, dropping "acting" from his title. (DSOF ¶ 33)

When Gary Jones was considering who to select as his deputy chiefs, he spoke with former Chief Fee. (DSOF ¶ 36) Fee told him that he would never put Patrick Murray in a position of trust. (DSOF ¶ 67) While Patrick Murray might otherwise have been a logical choice,

---

[2]Donaldson was elected over the incumbent, William Browne. Both are African American. (DSOF ¶ 20)

Fee felt that Murray had lied to him in an internal investigation into David Nelson's complaint that Murray had had inappropriate contact with Nelson's wife. (DSOF ¶ 69, 70, 71, 72, 74) Fee was also critical of Michael Garofalo's decision-making ability. (DSOF ¶ 91)

Jones knew Malcolm White from the negotiations Jones had had with the police union on a new union contract. (DSOF ¶ 46) While White had not held a supervisory position, Jones felt that he had the leadership qualities he was looking for and knew he had the respect of the officers he represented in the union. (DSOF ¶ 46, 47, 82) He also had experience as a tactical officer with the Village of Harvey which Jones believed gave White good "grass roots" experience.  (DSOF ¶ 25, 46) Chief Jones felt that Malcolm White would be the best person to carry out the goals and objectives he had for the Hazel Crest Police Department. (DSOF ¶ 51) He felt that White would be the best selection to serve the people of the Village of Hazel Crest as Jones' second deputy chief. Jones wanted the department to be better than it had been in the past and, taking all those things into account, felt that Malcolm White gave him the best opportunity to deliver on that goal. (DSOF ¶ 49, 51)  Jones' entire focus was to present law enforcement services to the community as best he could and to create a management team that in his view was able to perform. (DSOF ¶ 49) Patrick Murray himself was highly praiseworthy of Malcolm White in a review conducted just a year earlier, noting that he was an "excellent candidate for higher positions in the department." (DSOF ¶ 47) There was nothing that David Nelson observed about Malcolm White's personality, his skills or abilities as a police officer, or anything in his character or background that he believed would rule him out from serving as a supervisor. (DSOF ¶ 48)

Chief Jones felt that Malcolm White's qualifications were particularly suited for Jones' needs. (DSOF ¶ 46) Malcolm White was the clear leader among the patrol ranks.  (DSOF ¶ 55)

He was selected by his fellow officers, both black and white, to be their union representative. Malcolm White spoke well of his officers and made sure that their interests were represented. (DSOF ¶ 46)

On July 12, 2005, Gary Jones appointed Gary Gentzle and Malcolm White to the two vacant deputy chief of police positions — Gentzle as deputy chief of patrol and White as deputy chief of support services. (DSOF ¶ 40, 41) Before Malcolm White's appointment, no African American had ever held a supervisory position (sergeant or above) in the history of the Hazel Crest Police Department. (DSOF ¶ 44) At the time of his selection, the Village was approximately 76% black and 20% white. (DSOF ¶ 2, 14) Previously, in December 2004, Chief Fee had drafted a memorandum outlining the department's Equal Opportunity Action Plan. (DSOF ¶ 15) That plan outlined certain goals of the department, including that it was the goal of the Hazel Crest Police Department that the department's supervisory staff reflect the makeup of the population it served. (DSOF ¶ 15)

After selecting Gentzle and White as his deputy chiefs, Gary Jones named Patrick Murray as Administrative Sergeant in charge of accreditation. He reported directly to Chief Jones. (DSOF ¶ 75) David Nelson was promoted to Detective Sergeant, (DSOF ¶ 90) Mark Peers and Michael Garofalo remained patrol sergeants. (DSOF ¶ 80, 90)

The four plaintiffs each claim that they were better educated than Malcolm White and met more of the "desired minimum qualifications" set forth in the position description for the position of deputy chief of police. (DSOF ¶ 85) The deputy chief position description had been adopted by former Chief Fee when the position was first created in 2001. (DSOF ¶ 10) It is undisputed, however, that the position description contained only "desired" minimum qualifications, which were in no way "mandatory." (DSOF ¶ 10) If they were mandatory, David

Nelson would have been ineligible for the deputy chief position, because he had not been a sergeant for two years at the time Chief Jones made his selections. (DSOF ¶ 86, 87)

The position description explicitly provided that it did "not constitute an employment agreement between the employer and employee and [was] subject to change by the employer as the needs of the employer and the requirements of the job change." (DSOF ¶ 10, 11) It is undisputed that the only requirement for selecting an officer for the position of deputy chief, under both Illinois statute and the village ordinance adopting the statute, was that the individual be a sworn officer with at least five years on the department. (DSOF ¶ 8) Malcolm White met that qualification. (DSOF ¶ 25)

On December 1, 2005, at age 50, Patrick Murray announced his retirement from the Hazel Crest Police Department. (DSOF ¶ 95) He currently draws a pension from the Village in the amount of $52,000. He is employed as a senior law enforcement instructor at the Northwest Indiana Law Enforcement Academy in Gary, Indiana. at a salary of $43,000, in addition to his full pension. (DSOF ¶ 96)

On March 31, 2006, Mark Peers voluntarily retired from the Village of Hazel Crest. He draws a pension from Hazel Crest of roughly $37,000 per year. Upon retirement, he took a position as Commander with the neighboring City of Country Club Hills Police Department at a higher rate of pay. He started at $82,500 per year, in addition to his full pension from the Village of Hazel Crest. He currently earns $85,200 per year. He makes as much now as a deputy chief at Hazel Crest. Because of overtime, he would have been able to earn even more as a patrol sergeant – up to $15,000 to $30,000 more. (DSOF ¶ 97)

Michael Garofalo resigned and took a position as a police officer with the Village of Winnetka effective June 5, 2006, earning in excess of $72,000 per year and overtime of $5,000

to $6,000 per year. (DSOF ¶ 98) While he will continue to work as an officer for Winnetka, he plans to begin drawing his pension of roughly $36,000 per year from Hazel Crest on September 27, 2009, when he reaches age 50. (DSOF ¶ 98)  After eight years, he will be eligible for a pension from Winnetka as well. (DSOF ¶ 98)

David Nelson has remained with the Hazel Crest Police Department and continues to hold the rank of sergeant. Sergeants are paid overtime at Hazel Crest, while deputy chiefs are paid a straight salary and do not receive overtime. Nelson earned $80,648 as a sergeant in 2005. (DSOF ¶ 99) He earned "close to" $100,000 in 2006. (DSOF ¶ 99) In both 2005 and 2006, he earned more as sergeant than he would have as deputy chief. (DSOF ¶ 99) When appointed deputy chief in 2005, Malcolm White's salary was $72,133.16, inclusive of longevity pay. (DSOF ¶ 100)

## Argument

### I.     No Violation of Title VII

A claim of "reverse discrimination" under Title VII, requires application of a modified version of the *prima facie* case analysis under the *McDonnell Douglas* standard.  *Jones v. City of Springfield*, 540 F.Supp. 2d 1023, 1032 (C.D.Ill.2008). In a reverse discrimination case, white males must establish "background circumstances" which support an inference that the defendant is one of those unusual employers who discriminates against the majority.  *Id.*  (citing *Mills v. Healthcare Service Corp.*, 171 F.3d 450, 455 (7th Cir. 1999)); *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 820 (7th Cir. 2006).  If a plaintiff meets the "background circumstances" prong of the modified test, he then must show that he can meet the remaining steps of the traditional *McDonnell Douglas* standard: that (1) he applied for, and was qualified for the position; (2) he was not hired; and (3) an individual outside of the plaintiff's class was selected.

If he makes out a *prima facie case*, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged action. If the defendant proffers such a reason, the burden returns to the plaintiff who must then prove that the defendant's reason is a pretext – a lie. *Jones* at 1032 (citations omitted); see also, *Jackson v. City of Chicago*, 552 F.3d 619, 622 (7th Cir. 2009).

**A.     While Eligible, None of the Plaintiffs was "Qualified For" the Position**

The statute and village ordinance govern eligibility for the selection of officers to fill the position of deputy chief of police in Hazel Crest. (DSOF ¶ 5, 7) The *sole* requirement for selection is that the officer be a full-time sworn officer with at least five years experience with the department. (DSOF ¶ 8) In that sense, the plaintiffs, as well as many other members of the department, were "eligible for" the position.  Ultimately, however, it was up to Gary Jones as chief of police to determine what qualities in an individual were most important and whether there were elements in an officer's background or character which disqualified him from the position.(DSOF ¶ 34, 35, 41, 43, 93) Because the selection rests entirely upon the discretion of the chief, he determines who is "qualified for" the position.  (DSOF ¶ 8, 43, 68, 93)

The Illinois legislature specifically designated the position as an "exempt" position, meaning that the person selected does not have to go through the selection process set out for other police positions – testing, interview, publishing a list of qualified officers and selection from among the top three individuals. In fact, the statute when originally proposed in S.B. 271, required the selection be made from among the "supervisory rank" of officers as the plaintiffs contend should have occurred here. (DSOF ¶ 6) However, pursuant to a House amendment, the wording was changed so that in the final version, the statute provided that the selection could be made from  among "any rank of sworn officers." (DSOF ¶ 6)

The rationale behind making the position an "exempt" position could not be more clearly demonstrated than in this case. By making the position exempt and allowing the selection to be made at the sole discretion of the chief of police, there should be no squabbles, and concomitantly no litigation, over the selection of the candidate for the position. It was designed to avoid the very situation we have here – four officers each claiming that they were the "most qualified" for the position, with four separate federal lawsuits having been filed by the disappointed officers. If the plaintiffs' rationale is followed, any officer not selected for the position could come to court claiming that he or she was "more qualified" than the individual selected. *Enquist v. Oregon Dept. of Agriculture*, __ U.S. __, 128 S.Ct. 2146, 2156 (2008) ("any personnel action in which a wronged employee can conjure up a claim of differential treatment will suddenly become the basis for a federal constitutional claim" (in the context of an equal protection "class of one" claim)). The court system would usurp the chief's discretion to select his own deputy chief, and compel a court or jury to make the subjective determination as to who would best serve as the chief's second in command. Respectfully, neither a court nor a jury with no connection to the department, is in a better position than the chief to make that decision for the chief. *Millbrook v. IBP, Inc.,* 280 F.3d 1169, 1180 (7th Cir. 2002) ("neither the judge nor the jury is 'as well suited by training and experience to evaluate qualifications for high level promotion in other disciplines as are those persons who have trained and worked for years in that field of endeavor for which the applications under consideration are being evaluated.'" (citation omitted)). Courts do not sit as "superpersonnel boards" and can not "punish an employer for choices that constitute business decisions alone, no matter how unwise or mistaken they may seem to [the court]." *Guerrero v. Ashcroft*, 253 F.3d 309, 314 (7th Cir. 2001); *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005). Rather, the "qualifications" for the position are

those that the chief of police believes will best be able to accomplish his goals for the department. (DSOF ¶ 93) As the chief of police, he is in the best position to be able to determine what qualities in an individual will enable him to serve as his right hand in the administration of the police department.

In *Engquist*, an equal protection case, the Court noted that in the employment context, employers must often exercise their discretion and make decisions "based on a vast array of subjective individualized assessments." *Id.* at 2154. "[A]llowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." *Id.* Likewise here, allowing the plaintiffs to challenge Chief Jones' selection of Malcolm White, would undermine the discretion entrusted in the chief by the state legislature.

The court sought to avoid this very outcome in *Ekekhor v. Aon Service Group,* 2006 WL 2349982 (N.D. Ill., Aug. 9, 2006). In *Ekekhor*, three African American males sued Aon Service Corp. under Title VII alleging discrimination when Aon failed to promote them to supervisory accounting positions. *Id.* at *1. Noting that the decision-maker, Rizzo, based his decision of who to promote on subjective factors, the court stated, "Nothing in Title VII bans the use of subjective evaluation criteria, and the mere fact that the employer used subjective criteria does not establish pretext." *Id.* at 6. Addressing the plaintiffs' argument that another manager, Anyaegbunam, testified that he would have chosen one of the plaintiffs instead of Rizzo's choice of supervisor, the court noted, "In essence, the plaintiffs would have this Court replace Rizzo's judgment with Anyaegbunam's. The Court's role is to prevent discrimination, not to act as a super personnel department." *Id.* at *6. (citation omitted.)

The Supreme Court echoed this sentiment in *Bishop v. Wood,* 426 U.S. 341, 349 (1976). "The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." This could not have been what the Illinois legislature desired when drafting the deputy chief statute. Clearly, what the legislature wanted to *avoid* by investing the chief of police with the discretion to select his deputy chief, is the situation we now have.

This problem is further evidenced by the testimony of former chief Peter Fee who testified that, while Patrick Murray was articulate, well-educated and scored well on promotional exams, he would never have promoted Murray to a deputy chief position, or any position of trust. (DSOF ¶ 67, 74) He did not trust Murray.  (DSOF ¶ 67) He believed that Patrick Murray lied to him in his investigation of David Nelson's complaint against Murray. (DSOF ¶ 69)  He had fielded many complaints over the years about Murray's command style and the fact that officers below him believed that Murray favored certain officers over others. (DSOF ¶ 72) When Jones sought Fee's counsel before making his decision, Fee told Jones that he would never appoint Patrick Murray to a position of trust. (DSOF ¶ 67) Jones was well aware of Chief Fee's feelings about Murray and shared in his distrust. (DSOF ¶ 67)

Likewise, Chief Fee testified that while Sgt. Garofalo also did well on promotional exams and looked good on paper, when he was in the field, he had trouble making decisions and had to frequently contact Deputy Chief Lenz in deciding what to do.  (DSOF ¶ 92) Again, Chief Fee discussed with Gary Jones, Garofalo's difficulty making decisions, a factor Gary Jones took into account. (DSOF ¶ 93)

If in fact the position is truly exempt, and if the selection is to be made at the sole discretion of the chief of police in determining who is best qualified for the position, then Chief

Jones' should not have to risk having officers in whom he has no trust or confidence thrust upon him. (DSOF ¶ 68)

**B.    Even assuming the plaintiffs have made out a *prima facie* case, Gary Jones had legitimate reasons for not selecting the plaintiffs.**

The village does not concede that the court need even examine Chief Jones' reasons for selecting Gary Gentzle and Malcolm White as his deputy chiefs. The deputy chief position is an exempt position under the law. That law imbued the chief with the sole discretion to make his choices. Questioning why the chief made his choices destroys that discretion. Nonetheless, Chief Jones had legitimate, non-pretextual reasons for not selecting the Plaintiffs.

**1.  Jones had valid, non-pretextual reasons for not selecting the plaintiffs.**

Chief Jones selected Malcolm White as Deputy Chief for Support Services because he felt that he was the best choice to assist Chief Jones in accomplishing the goals and objectives Jones had for the department. (DSOF ¶ 51) He was a leader within the patrol force. (DSOF ¶ 47) He had shown exceptional leadership qualities and was well respected by both black and white officers. (DSOF ¶ 82) His serving as union steward for the patrol officers demonstrated his leadership abilities and the respect he commanded within the patrol officer ranks. (DSOF ¶ 82) On the other hand, Chief Jones had very legitimate reasons for *not* selecting the plaintiffs for the position. He did not want to chose any of the Plaintiffs for the position. (DSOF ¶ 57, 58, 63)

**Patrick Murray**

Chief Jones was aware of the allegations made against Patrick Murray by David Nelson. Jones was involved in the internal investigation of Sgt. Murray based on the allegations by Sgt. Nelson that Murray had made advances toward Nelson's wife when Murray was Nelson's superior officer. (DSOF ¶ 70) Chief Jones did not feel that he could place his trust and confidence in Murray as a result. (DSOF ¶ 67) Moreover, Jones did not believe that the rank and

file officers would respect Murray as a deputy chief. (DSOF ¶ 73) He also considered Peter Fee's opinion that he did not trust Murray. He had previously been told by Chief Fee that Fee would never put Murray in a position of trust on the department and that even Chief Fee's predecessor, Harold Moore, had felt the same way. Chief Moore had also told Gary Jones the same thing many times. He had to consider all of those issues in deciding who to choose to be the leader of the men and women in the department. In addition to discussing the matter of Nelson's complaint about Murray and Nelson's wife, Jones was aware of Fee's opinion that Murray was for much of his career, anti-establishment or anti-administration and would always go against whatever the administration was doing. (DSOF ¶ 67)

**Mark Peers**

Mark Peers asked to be considered for the Deputy Chief *of Patrol* position. Chief Jones told him that he had already selected Gary Gentzle for the position, but was considering Peers for the Detective Sergeant position. Peers told Chief Jones that if he could not be the Deputy Chief of Patrol, he would rather stay as a patrol sergeant since he would have the most seniority of any officer on the street and could pick his own schedule. Jones did not consider him for any other position based on his comments. To the extent he was considered at all, Peers took himself out of the running for the position by his comments. (DSOF ¶ 80)

Moreover, Jones did not believe that Peers had the respect of the men he supervised and worked with. He had a reputation as having a volatile personality and was given the nickname "Hank" by one of the plaintiffs – a reference to the Jim Carey character by that name from the movie, "Me, Myself and Irene." Each of the plaintiffs referred to him as "Hank." He would be angry one time, then act differently on others. (DSOF ¶ 81)

**Michael Garofalo**

Garofalo had never asked to be considered for the position of deputy chief. In fact, Garofalo was upset that he was not considered for the position of detective sergeant when Nelson's selection was announced. He had previously told Jones he wanted to be considered for the detective sergeant position. Jones told him that he had selected Nelson for the detective sergeant position because he wasn't sure if he could depend upon Garofalo, since Garofalo had asked to be released from detectives in 1998 for personal reasons and had previously voluntarily resigned from the SSERT (South Suburban Emergency Response) team. (DSOF ¶ 90)

Chief Jones felt that Sgt. Michael Garofalo did not have the leadership skills or decision making skills necessary to hold the deputy chief of support services position. Jones did not believe he had the ability to make decisions. Jones formed his mental impressions of Garofalo from working with him in the detective division. This opinion was supported by others in the department, including former chief Peter Fee. (DSOF ¶ 91)

Chief Fee told Gary Jones, that, while he had the qualifications and did extremely well when competing for the position of sergeant, in every day practice, Garofalo was very hesitant to make a decision. He often had to go to Deputy Chief Lenz to get assurance that the decision he was making was correct. Jones concurred with Fee's assessment. (DSOF ¶ 92)  Even Garofalo agreed that when the chief, as the decision-maker, is deciding who to select as his deputy chief, he must make a judgment call as to whether or not the person selected would be able to demonstrate strong leadership qualities, use them to motivate employees and be able to effectively delegate responsibilities to first-line supervisors. (DSOF ¶ 93)

**David Nelson**[3]

---

[3]Counsel for Nelson advised this week that Nelson would be dismissing, with prejudice, all claims in this matter.

Chief Jones felt that Sgt. Nelson was lackadaisical in his attitude and did not have the command presence he was looking for in a deputy chief. He wanted someone strong in the position and did not see that in Sgt. Nelson. Sgt. Nelson felt it was easier to be someone's friend than their boss or disciplinarian and that was not what Chief Jones was looking for in making his selection. Chief Jones wanted someone who possessed leadership skills beyond question. He did not see that in Nelson. For those reasons, in the exercise of discretion, he did not choose Sgt. Nelson for the position.(DSOF ¶ [4] 88)

*Nanavaty v. City of Indianapolis*, 2001 WL 1781924 (S.D. Ind. Dec. 19, 2001), bears many similarities to the case at hand. There, the plaintiff, an Asian-American, filed a Title VII action claiming that the former chief of police discriminated against him on the basis of his race and national origin when he did not appoint him to the rank of Major on the Department. *Id*. at *1. The rank of Major is an "appointed [rank] made solely within the Chief of Police's discretion pursuant to police merit law." Individuals holding the position of Major serve at the pleasure of the chief. *Id*. at *11. Because the chief believed that the plaintiff had performed poorly in a press interview, the chief had already indicated that he would never appoint the plaintiff to a more senior position in the department. *Id*.

In *Nanavaty*, the court noted that "the promotion in question was not a typical merit promotion. *It was instead an appointment to one of a handful of appointed positions that are made at the discretion of the Chief.* In other words, the Majors hold leadership positions in which the Chief of Police can appoint *those officers in whom he had confidence to carry out his*

---

[4]For as strongly as plaintiffs argue that the position description precluded Chief Jones from selecting Malcolm White as deputy chief because he did not meet the "Desired Minimum Qualifications," Nelson did not meet them either, as he had not been a sergeant for two years. Nelson cannot on the one hand argue that Hazel Crest's personnel policies are inconsistently applied, while at the same time attempt to claim a benefit from the flexibility in their application. *Walker v. Abbott Laboratories*, 416 F.3d 641, 644 (7th Cir. 2005).

*policies.*" *Id.* (emphasis added). In further support of its finding that summary judgment in favor of the defendants was proper, the court stated:

> "The undisputed facts in this case show that Majors in IPD are senior leaders who work closely with the Chief and from whom the Chief is entitled to expect confidence and support. Chief Zunk did not violate Nanavaty's First Amendment rights by taking into account, when making the Major appointments, Nanavaty's public statements which, in Zunk's view, cast the Department in a negative light." *Id.*

For similar reasons, the court found that there was no discrimination under the plaintiff's Title VII claim. While the court stated that the plaintiff satisfied the elements of a *prima facia* case, because the Lieutenants who were appointed Majors instead of Nanavaty had similar or lesser qualifications and were not Asian-American, the court found that the City offered a legitimate, non-discriminatory reason for not selecting the plaintiff for Major. *Id.* at 13. In meeting its burden to establish a non-discriminatory reason for the non-selection of the plaintiff, the court stated:

> "[T]he City asserts that 'Nanvaty was not someone Zunk wished to appoint per his discretion under merit law.' There is no doubt that Nanavaty was not high on Zunk's list of senior officers in whom he had great confidence, as discussed above regarding Nanavaty's television interview and Zunk's response to it." *Id.*

Finding that the City's reason for not selecting the plaintiff was good enough, the court noted that it must take care not to assume the oft cited role of "super personnel department" and that the Chief was entitled to appoint as Majors, officers in whom he had greater confidence than he had in Nanavaty. *Id.* at *14.

In *Underwood v. Waddell*, 743 F.Supp. 1291 (S.D. Ind. 1990) the court addressed a similar issue in the context of a §1983 claim. As here, pursuant to statute, the selection of the chief deputy was outside the merit selection process for other ranks and gave the sheriff

"complete hiring authority" over the appointment. *Id.* at 1295. After the sheriff fired him, the plaintiff claimed he had a property interest in the position and was denied due process.

The court noted that the position of chief deputy "is one of great confidence *vis-a´-vis* the Sheriff." *Id.* at 1292. The chief deputy was the sheriff's "right hand man" and "confidant." *Id.* at 1297. Noting that the sheriff did indeed have complete hiring authority over his chief deputy, the court explained why this was important, given the close nature of the position.

> "[T]o rule otherwise would force sheriffs to retain a chief deputy, a position that is obviously intended to be one of great confidence, even when that deputy's behavior has destroyed that trust.
>
> * * *
>
> [I]t is entirely logical to conclude that the reason the legislature gave sheriffs complete hiring authority over their chief deputy was to promote the efficient operation of sheriffs departments by providing the sheriff with a deputy in which he could confide." *Id.* at 1298.

The same rationale applies to the deputy chief selection process here. The legislature clearly invested the chief of police with the authority to select the person *he* felt was best for the position when it made the position an "exempt" position, taking it out of the realm of the board of fire and police commissioners.

The plaintiffs would have this court or a jury determine who would best have served Chief Jones as his deputy chief. On paper, Patrick Murray or Michael Garofalo might look like good candidates. However, promoting the "most educated," or the officer with the "most seniority" or the one who scored best on the sergeant's promotional exam, might result in promoting an officer the chief does not trust, does not like, cannot rely upon and never would have been his choice to serve as deputy chief. As in *Underwood*, the reason the position is "exempt" is to prevent an officer from being foisted upon the chief, just as the plaintiffs now seek to do.

Gary Jones made his decision based upon who he felt would be the best person to serve as his second in command. He had legitimate reasons for not selecting the plaintiffs. He believed that, taking everything into account, including the reservations he had with respect to each of the plaintiffs and the leadership qualities he saw in Malcolm White, that White was the person most qualified to serve as his deputy chief. In the context of a failure to promote claim where the employer believes that it has chosen the more qualified candidate, to demonstrate pretext a plaintiff must establish that his qualifications are so superior to the credentials of the person selected that no reasonable person could have chosen anyone but the plaintiff. *Millbrook v. IBP Inc.*, 280 F.3d 1169,1180 (7th Cir. 2002). None of the plaintiffs have made that case.

In *Raymond v. City of Chicago*, 183 F.Supp.2d 1060 (N. D. Ill., 2002) the plaintiff, a Chicago police officer, sued Superintendent of Police Terry Hilliard for failing to appoint her to the rank of commander, an exempt position within the Chicago police department. She claimed that he did so out of retaliation and sued under Title VII. *Id*. at 1064. Supt. Hilliard testified that in determining which officers to promote to exempt positions such as commander, he considers "their integrity, character, morals and values." He also considers how officers interact with young police officers as well as citizens and considers whether officers are "team players" and whether they are "able to carry out the mission of the department." In Raymond's case, Hilliard did not select her because he did not feel that she was a team player, did not believe that she shared his vision of the department nor did he have confidence in her. *Id*. at 1064.

The court determined that the reasons proffered by Supt. Hilliard for not selecting Raymond for a commander position were legitimate and non-discriminatory. As here, the City argued that "because appointments to captain and exempt ranks are discretionary, the superintendent is entitled to promote personnel in whom he has confidence and who he believes

share his goals for the department." *Id*. at 1074. Gary Jones did not want to select any of the plaintiffs. He did not have trust or confidence that they could assist him in carrying out the goals and objectives of the department. For these reasons, the Village is entitled to summary judgment as to each of the plaintiffs' claims.

> 2. **"Diversity" is not the bogeyman plaintiffs contend it is and the fact it was considered does not defeat summary judgment.**

Throughout the depositions in this case, plaintiffs' counsel phrased their questions so as to raise the implication that if "diversity" (meaning racial diversity) was in any way considered in making the deputy chief selections, they would have proven that Chief Jones' selection of Malcolm White was discriminatory and would prevail here. An examination of the case law clearly shows that premise to be unfounded. *Petit v. City of Chicago*, 352 F.3d 1111 (7th Cir. 2004) Moreover, having a diverse police force, reflecting the makeup of the community it served, was a goal established by Chief Fee as part of the accreditation process before Gary Jones was even appointed chief. (DSOF ¶ 15) *Petit* said police departments should strive for a diverse police force. Murray, Garofalo, Peers and Nelson each believed that this was a proper goal for the department to strive for. (DSOF ¶ 15) Citing an even earlier case and one in which the language echoes the objectives set out in Chief Peter Fee's December 2004 EEO Statement, the court stated in *Petit*:

> "In another case involving promotions to sergeant, we found that '[t]he composition and operation of an effective police force should be in as complete harmony as possible with the community from which it springs.'" *Petit* at 1115. (citing, *United States v. City of Chicago*, 663 F.2d 1354, 1364 (7th Cir. 1981) (*en banc*)).

After quoting from the Supreme Court's decision in *Grutter v. Bollinger*, 539 U.S.306 (2003), that "effective participation by members of all racial and ethnic groups in the civil life of

our Nation is essential if the dream of one Nation, indivisible, is to be realized," the court went

on to state:

> "It seems to us that there is an even more compelling need for diversity in a large metropolitan police force charged with protecting a racially and ethnically divided major American city like Chicago. Under the *Grutter* standards, we hold, the City of Chicago has set out a compelling operational need for a diverse police department." *Id* at 1114.

Explaining why a diverse police force is important, the court said:

> "The reality of urban policing is that minorities are frequently mistrustful of police and are more willing than non-minorities to believe that the police engage in misconduct. . . . On the other hand, when police officers are routinely supervised by minorities, the fears that the police department is hostile to the minority community will naturally abate." *Id.*

The court stated that it had previously recognized "that a visible presence of minorities in

supervisory positions is critical to effective policing in a racially diverse city like Chicago

because supervisors "set the tone for the department." *Id*. at 1115. In *Wittmer v. Peters*, 87 F.3d

916 (7th Cir. 1996), the court noted that other cases have "single[d] outlaw-enforcement and

correctional settings as the very *clearest* examples of cases in which departures from racial

neutrality are permissible. *Id.* at 919. (citations omitted. emphasis in the original).

The court in *Petit*, noted that the Supreme Court in *Grutter*, had emphasized that, in

making selections, race must be used in a "flexible, non-mechanical way" and that "race can be a

'plus' factor in the context of individualized consideration of each and every applicant." *Id*. at

1116, quoting *Grutter* at 2342.

The fact that Malcolm White's race was *one fact* that was considered (DSOF ¶ 52), does

not *ipso facto* make the decision discriminatory. Police departments can take race into account in

making decisions and, as the Supreme Court noted, race can be "plus factor" in making an

individualized decision. The fact that Chief Jones recognized that the new mayor campaigned on

a platform of diversity, and that Chief Fee before him had issued a written directive that one of the goals and objectives of the Hazel Crest Police Department was that the department's supervisory staff "reflect[] the make up of the population it serves," should go to his credit in making his selection, rather than count against him as the plaintiffs posit. Moreover, the fact that there may have been desire on the part of the new administration to see African Americans appointed promoted within the department, or even pressure as claimed by the plaintiffs, does not support an inference of intentional discrimination. *Jones v. City of Springfield*, 540 F.Supp. 2d 1023, 1032 (N.D.Ill. 2008). That desire on the part of the new administration is only part of the "background circumstances" the white plaintiffs are required to establish in any case.

## II.    The Plaintiffs' interpretation of the position description for deputy chief impinges on State law and is therefore prohibited.

As a non-home rule municipality, Hazel Crest could not adopt regulations that infringed upon the spirit of state law or were repugnant to the general policy of the state. *Hawthorne v. Village of Olympia Fields*, 204 Ill.2d 243, 258-259 (2003). Ordinances that conflict with the spirit and purpose of a state statute are preempted by the statute. Where there is a conflict, the ordinance must give way. *Id.* at 259.

Here, the Village's ordinance tracked the language of the state statute. The plaintiffs contend, however, that the *position description* adopted by former chief of police, Peter Fee in 2001, controls the selection of the candidate for deputy chief. The position description does not, and cannot, control the selection process. First, the position description itself says that it is subject to change at any time depending upon the needs of the department. (DSOF ¶ 10, 11) Moreover, reading the "Desired Minimum Qualifications" as mandatory would have the effect of rendering the language of the statute and ordinance meaningless, a fact even Nelson admits. (DSOF ¶ 9) Under the statute and ordinance, the selection can be made from "any rank of sworn

officer". (DSOF ¶ 8)  Mandating two years of supervisor experience as the plaintiffs argue, would mean that the selection could *only* be made from those officers holding the rank of sergeant.[5] The Illinois Supreme Court in *Hawthorne* held that state law cannot be infringed upon in this way. "Because it is a non-home rule unit, Olympia Fields cannot adopt the ordinances under a general grant of power that infringe upon the spirit of state law or are repugnant to the general policy of the state." *Id.* at 258-259.

This proposition gains strength from the fact that the legislature did at one time consider requiring the selection of deputy chief to be made from "supervisory ranks." However, it chose to delete that requirement from the final version of the law, providing instead that the chiefs of police are free to choose their deputy chiefs from among *any* rank of sworn officer so long as the officer has had five years experience with the department. (DSOF ¶ 6, 8) In *Hawthorne*, the Supreme Court referred to an earlier decision involving the Village of Wauconda's attempt to regulate pesticide use in the village. In prohibiting the restriction, the court stated:

> "If followed, Wauconda's ordinance would have enabled the village, which was a non-home-rule unit, to prevent persons from applying pesticides even though they had been duly licensed to do so by the state. We found that to be impermissible." *Hawthorne* at 261.

So too here, if the plaintiffs' interpretation of the position description is given credence, it would prohibit a chief from ever selecting a patrol officer as his deputy chief, even though state law allows it. If a village ordinance, passed by the entire village board as in *Hawthorne*, can be preempted by state statute, then the non-mandatory position description in question has even less standing. It is clearly no impediment to the chief choosing a patrol officer if he believes it to be in the department's best interest in terms of the chief's ability to accomplish his goals.

---

[5]In addition it would have the effect of eliminating David Nelson from consideration completely, since at the time Chief Jones made his selections for deputy chief, Nelson had not been a sergeant for two years. (DSOF ¶ 86)

## III.    No Constructive Discharge

In order to state a claim for "constructive discharge" in a Title VII case, the plaintiffs must show that they were subjected to "intolerable working conditions." Working conditions for constructive discharge must be even more egregious than the high standard for hostile working conditions because in the ordinary case, an employee is expected to remain working while seeking redress. *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000); *Zich v. Glenbrook Sch. Dist. 225*, 2004 WL 524707 (N.D.Ill. March 17, 2004); *Kaupas v. Village of University Park*, 2003 WL 22048173 *10 (N.D.Ill. 2003). The work environment must be so extreme a situation as to warrant resignation "as the only alternative to avoiding or overcoming the hostile environment." *Kaupas* at 10; *Drake v. Minnesota Mining & Manuf. Co.*, 134 F.3d 878, 886 (7th Cir. 1998); This is even more true in the instant case, where at most only one of the four plaintiffs could have actually been selected for the open deputy chief position. Would any of the plaintiffs have a "constructive discharge" claim had one of the other plaintiffs been selected for the position? The answer is clearly, "No."

In fact, Murray was selected by Chief Jones for the Administrative Sergeant position, which allowed him to travel around the country for additional training in his role of overseeing the department's accreditation process. He had significant autonomy as he reported only to the chief of police and no one else. Murray enjoyed accreditation management. (DSOF ¶ 75)  Nelson was selected for the Detective Sergeant position. (DSOF ¶ 90)  Far from being "constructively discharged," Peers and Garofalo continued to work as supervisors as two of the six sergeants on the department. (DSOF ¶ 89, 90) The fact of the matter is that of those who left, Murray, Peers and Garofalo, all significantly improved their own personal financial situations. (DSOF ¶ 96, 97, 98)

None of the plaintiffs have presented evidence of "intolerable" working conditions or conditions so extreme they had no choice but to resign. Regardless of who Jones selected, the others would be in the same position they are in now – there was only one position open. While they may have been disappointed, Murray, Peers and Garofalo each chose to retire and pursue other employment opportunities. Murray and Peers are collecting their pensions from the Village and Garofalo will be eligible to do so this year. Each is doing better financially than while at Hazel Crest. (DSOF ¶ 96, 97, 98)  The Village is entitled to summary judgment on their claims of constructive discharge.

**Motion to Dismiss**
**<u>Non-Title VII Counts of Plaintiffs' Complaints</u>**

Each of Plaintiffs' claims included a count based on Title VII as count I of their complaint. Each then added claims based on the same facts but setting forth separate theories of recovery, including claims for §1983 interference with civil rights, §1981 interference with contract based on race, §1985 conspiracy and breach of contract (State law). (See "Summary of Plaintiffs' Claims," Appendix) Only Nelson's complaint was different in that it did not include a §1983 interference with civil rights claim. On May 30, 2006, the Village filed a motion to dismiss counts II - V of Murray's complaint. At the court's recommendation, Murray agreed to dismiss those counts. The other plaintiffs did the same. (See "Summary of Plaintiffs' Claims," Appendix) The court has now allowed those counts to be reinstated and allowed the Village, Gary Jones, Robert Palmer and Robert Donaldson to reinstate their motion to dismiss originally directed to Murray's complaint. The court requested that the brief on the motion to dismiss the non-Title VII counts be included with the brief in support of the motion for summary judgment on the Title VII counts.

For the sake of brevity, the defendants incorporate their brief filed in support of their Rule 12(b)(6) motion to dismiss Murray's complaint by reference. (Murray (06 C 1372), Doc. No. 9, May 30, 2006; (Appendix). Defendants will summarize their arguments below and supplement as necessary.

## I.     Deprivation of Property Interest in Employment (§1983)<br>(Murray, Peers and Garofalo (Count II))

It is unclear whether plaintiffs claim that the property interest they were deprived of was their failure to be named deputy chief or the fact that they claim they were "constructively discharged."  Since Nelson does not make this claim and since he is the only one still employed by the Village, defendants assume that the property interest that Murray, Peers and Garofalo were deprived of was their employment as Hazel Crest police officers. It is undisputed that each of them resigned or retired from their positions. None were terminated by the Village. To the extent they claim constructive discharge, their claims fail for the same reasons set forth in section III above. (See also, argument made in defendants' motion to dismiss count II of Murray's complaint, (Appendix)).

## II.     Interference with Right to Promotion §1981<br>(Murray, Peers and Garofalo (Ct. III), Nelson (Ct. II))

Each plaintiff alleges that the defendants intentionally interfered with a contractual relationship of employment with the village by not selecting him for the position of deputy chief of police in violation of 421 U.S.C. §1981.

### A.     Claims for violation of §1981 not brought pursuant to §1983 must be dismissed.

Each plaintiff has included a claim purporting to state a cause of action for "Intentional Interference with Plaintiff's Contractual Relationship of Employment Based on Plaintiff's Race,

in Violation of 42 U.S.C. §1981." There is no direct cause of action under §1981, however, and all such claims must be dismissed.

> "Plaintiff additionally brings a claim for violation of her constitutional rights under 42 U.S.C. § 1981. When making a constitutional claim against a state actor, the proper claim is under § 1983, which provides the exclusive federal damages remedy for the violations of the rights guaranteed by § 1981 when that claim is, as here, against a state actor. *Jett v. Dallas Independent School District,* 491 U.S. 701, 703, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Accordingly, all claims arising from § 1981 are dismissed." *Easton v. College of Lake County* ,584 F.Supp.2d 1069, 1075 (N.D.Ill. 2008)

As each of the individual defendants is alleged to be a state actor, plaintiffs' §1981 claims fail as the were not brought pursuant to §1983. *Nolen v. City of Chicago*, 1998 WL 111675 *6 (N.D.Ill. 1998).

**B.      Claims fail for same reasons as Title VII claims.**

The same analysis is used in analyzing claims under §1981 as in Title VII. "The Seventh Circuit analyzes both Section 1981 and Title VII discrimination claims under the same standard of liability. *Bratton v. Roadway Package System, Inc.*, 77 F.3d 168, 176 (7th Cir.1996)." *Hefley v. Davis*, 2008 WL 5114647 *2 (N.D.Ill. 2008). The plaintiffs' claims fail under Title VII for the reasons set forth above in support of defendant's motion for summary judgment. Accordingly, any claim under §1981 would fail for the same reasons.

**C.      Plaintiffs have not established custom or policy for municipal liability under §1981.**

In order to establish liability against a municipality under §1981, the plaintiffs must "show that the violation of [their] 'right to make contracts' protected by §1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases." *Looper Maint. Serv. Inc. v. City of Indianapolis*, 197 F.3d 908, 913 (7th Cir. 1999); see also *Alexander v. City of*

*Milwaukee*, 474 F.3d 437, 448 (7th Cir. 2007) ("Section 1981, like § 1983, also requires a

plaintiff to demonstrate an official policy or custom in order to allow for municipal liability.").

> "[R]ecovery against a governmental body under § 1981 may not be based on
> respondeat superior. The plaintiff must show that the body's official policy or
> custom was discriminatory. See *Jett v. Dallas Independent School District*, 491
> U.S. 701, 736-37, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), applying to suits
> under § 1981 the principles devised for § 1983 litigation by *Monell v. New York
> Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611
> (1978). See also *Federation of African American Contractors v. Oakland*, 96 F.3d
> 1204, 1215 (9th Cir.1996) (concluding that this aspect of *Jett* remains good law
> after the 1991 amendments to § 1981). Demonstrating that an executive official,
> even a high ranking one, engaged in discrimination is insufficient. *Auriemma v.
> Rice*, 957 F.2d 397 (7th Cir.1992)." *Smith v. Chicago School Reform Bd. of
> Trustees*, 165 F.3d 1142, 1148 (C.A.7 (Ill.),1999).

Plaintiffs have pled no facts to establish any such custom or policy and therefore the claim

against the Village must be dismissed.

### III.    Complaints Do Not State a Claim for Conspiracy under §1985 pursuant to the Intracorporate Conspiracy Doctrine (Murray, Peers and Garofalo (Ct. IV),Nelson (Ct. III))

Each plaintiff alleges that the defendants conspired together by agreeing not to object to the

promotion of an unqualified employee (Malcolm White), in violation of their constitutional rights

under §1985.  All of the defendants were employees of the Village of Hazel Crest (mayor, police

chief, and village manager).  Since they each were employed by the Village, they could not conspire

with one another pursuant to the intracorporate conspiracy doctrine . *Allen v. City of Chicago,* 828

F.Supp. 543 (N.D. Ill. 1993) *Allen* held that the mayor, a city commissioner, and various unnamed

members of the same municipality, were not separate persons capable of conspiring with each other

for the purposes of §1985. *Id*. at 564. Under the intracorporate conspiracy  doctrine, a conspiracy

cannot exist solely between members of the same entity. *Payton v. Rush-Presbyterian-St. Luke's

Medical Center,* 184 F.3d 623 (7th Cir. 1999); *Wright v. Illinois Dept. of Children & Family

Services*, 40 F.3d 1492, 1508 (7th Cir.1994).  Managers of a corporation jointly pursuing its lawful

business do not become "conspirators," for purposes of a claim of a conspiracy to interfere with civil rights, when acts within the scope of their employment are said to be discriminatory. *Wright, Id.* at 1508. Since the actions of the defendants were all performed within the scope of their job duties for the same employer, no cause of action for conspiracy can survive.

**IV.    State Law Breach of Contract Claims based on Personnel Manual (Murray, Peers and Garofalo (Ct. IV), Nelson (Ct. III))**

The plaintiffs' claims for breach of contract under Illinois law against the Village of Hazel Crest, based upon the Village's Personnel Manual (attached to each of their complaints), fail because the personnel manual contains a clear disclaimer precluding the formation of any contract claim arising out of plaintiffs' failed claims of promotion to deputy chief. Section A,1.0 of the manual, page three, states in bold type:

> **"THIS MANUAL IS NOT INTENDED NOR SHOULD IT BE CONSTRUED AS AN EMPLOYMENT CONTRACT, EITHER EXPRESSED OR IMPLIED, BETWEEN THE VILLAGE OF HAZEL CREST AND ANY VILLAGE EMPLOYEE. THE MANUAL IS SUBJECT TO REVISION, AMENDMENT AND CHANGE AT ANY TIME AT THE SOLE DISCRETION OF THE VILLAGE."**

When a disclaimer is present in an employee handbook and it specifically disclaims that it is a contract, the disclaimer is the best evidence of whether the parties intended to form a contract. The disclaimer is enough to show that the handbook does not create legal rights. *Garcia v. Kankakee County Housing Authority,* 279 F.3d 532, 535-536 (7th Cir. 2002) There was no contract between the plaintiffs and the Village and the plaintiffs did not have a property interest in a promotion to deputy police chief. As there was no contract, there was no breach of contract and this count should be dismissed.

**V.    Defendants are Protected by Qualified Immunity with Respect to Chief Jones' Decision.**

Finally, each of the individual defendants is protected from liability under the federal claims by qualified immunity Although qualified immunity is a defense, plaintiffs carry the burden of defeating it. *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007).

> "It may have been clearly established that such conduct violated Illinois law and the standard operating procedures for the City of Elgin Police Department, but Plaintiffs must also show that the conduct was so severe that "a reasonable person would have known of the unconstitutionality of the conduct at issue." *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000). This requires either that the plaintiff point to closely analogous cases, *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), or prove that the right is "so clear... that no one thought it worthwhile to litigate the issue." *Brokaw*, 235 F.3d at 1022.

The plaintiff must do more than merely prove that a general right, such as the right to be free from discrimination, was clearly established. See *Anderson*, 483 U.S. at 639, 639-40, 107 S.Ct. 3034, *Morrell v. Mock*, 270 F.3d 1090, 1100 (7th Cir.2001)." *Dunn v. City of Elgin, Illinois* 347 F.3d 641, 650 (7th Cir. 2003).

While defendants do not concede that Gary Jones' selection of Malcolm White as deputy chief was based on race, assuming for sake of argument that it was, it was far from clear when the decision was made, and remains so today, to what extent race can be taken into consideration in making a discretionary employment decision. After reviewing the plurality opinion in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995), and commenting that in that case "enough other Justices reject subjecting reverse discrimination [] to strict scrutiny to create a majority of the Court in favor of permitting some reverse discrimination," Judge Posner stated:

> "How *much* reverse discrimination is permitted is unclear. All that is clear is that discrimination in favor of a minority is sometimes permissible to rectify past discrimination against that minority by the discriminating institution." *Wittmer* at 918 (emphasis in the original).

Since then, the Supreme Court decided *Grutter v. Bollinger*, 539 U.S. 306 (2003), holding that "student body diversity is a compelling state interest that can justify the use of race in university

admissions." *Id.* at 329. Following *Grutter*, Judge Evans noted that there was an even more compelling need for diversity in a metropolitan police force charged with protecting a racially divided city. *Petit* at 1114. Accordingly, whether and to what extent Chief Jones could take Malcolm White's race into account was not clear when he made his decision. He believed he had the discretion to do so. The defendants are entitled to qualified immunity because it was not clearly established that Gary Jones' use of discretion in selecting an African American police officer for the position of deputy chief, was unconstitutional at the time the decision was made. *Pearson v. Callahan*, ___ U.S. ___, 129 S.Ct. 808, 821 (2009).

WHEREFORE, for the above-stated reasons, Defendants request this Honorable Court to grant the Village's Motion for Summary Judgment as to Count I and their Motion to Dismiss Counts II, III, IV and V of Plaintiffs' Complaints for failure to state a claim upon which relief can be granted.

Respectfully submitted,

By: s/ Thomas R. Weiler_____
       Attorney for Defendants


Thomas R. Weiler (ARDC No. 06184955)
NORTON, MANCINI & WEILER
Attorneys for Defendants
111 West Washington Street, Suite 835
Chicago, IL 60602-2793