IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL J. GAROFALO,<br><br>                Plaintiff,<br>vs.<br><br>VILLAGE OF HAZEL CREST;<br><br>                Defendants. | No. 06C003674<br>**(CONSOLIDATED WITH 06C001372)**<br><br>Judge William T. Hart<br><br>Magistrate Judge Morton Denlow |

<u>**L.R. 56.1 Statement of Material Undisputed Facts**</u>

The Village of Hazel Crest for its LR 56.1 Statement of Material Undisputed Facts, states as follows:

### Organization of the Police Department

1. At all times at issue, the Village of Hazel Crest was a non-home-rule municipality of less than 130,000 inhabitants. (Exh. BB, U.S. Census Bureau, 2008 population estimate for Hazel Crest village, Illinois., available at http://factfinder.census.gov/servlet/SAFFPopulation?_event=ChangeGeoContext&geo_id=16000US1733695&_geoContext=01000US&_street=&_county=Hazel+Crest&_cityTown=Hazel+Crest&_state=04000US17&_zip=&_lang=en&_sse=on&ActiveGeoDiv=&_useEV=&pctxt=fph&pgsl=010&_submenuId=population_0&ds_name=null&_ci_nbr=null&qr_name=null&reg=null%3Anull&_keyword=&_industry=(last visited July 30, 2009))

2. The population of the Village of Hazel Crest is approximately 80% African American. (Exh. E, Palmer Dep., p. 231)

3. Before 2001, the Hazel Crest Police Department consisted of a chief of police, one lieutenant, five sergeants and below them the patrol officers. The Board of Fire and Police Commissioners selected officers off of eligibility lists for the lieutenant and sergeant positions after the candidates took a written test, submitted to an oral interview and were awarded "chief's points." (Exh. I, Jones Affidavit)

4. One of the sergeant's positions was that of administrative sergeant. Gary Jones had held the position of administrative sergeant in charge of accreditation before the deputy chief positions were created. As administrative sergeant, he did not have any supervisory duties – only accreditation. He reported directly to the chief of police. (Exh. G, Jones Dep., p. 14, 216; Exh. D, Peers Dep., p. 61-62)

### Deputy Chief Statute and Village Ordinance

**Illinois Statute**

5. Section 10-2.1-4 of the Illinois Municipal Code (65 ILCS 5/10-2.1-4) was amended effective August 19, 1999, to allow for the selection of two deputy chiefs by the chief of police from among any rank of sworn officers with at least five years experience with the department, in non-home rule communities with a population of 130,000 or fewer. (Exh. L, Deft. Dep. Exh. 1, 65 ILCS 5/10-2.1-4 (West 2008) (Public Act 91-615))

**Legislative Amendment**

6. Prior to passage, the proposed amendment to the Municipal Code (SB171) originally provided that the deputy chief position be appointed from any "supervisory ranks of the municipality's full-time police officers. "Supervisory rank" meant any person holding a rank that is excluded from collective bargaining by virtue of the supervisory responsibilities. See Exh. X, Senate Transcript, March 25, 1999, State of Illinois General Assembly, Regular Session, 27th Legislative Day; Exh. Y, SB171 Engrossed, http://www.ilga.gov/legislation/legisnet91/sbgroups/sb/910SB0171eng.html (last accessed 11/12/2007). However, House Amendment No. 1 to SB171 removed the requirement that the deputy chief be appointed from among the sworn officers of supervisory rank, but required the appointee to have at least five years of service as a police officer with the police department. See Exh. Z, 91st General Assembly, Status of SB0171, http://www.ilga.gov/legislation/legisnet91/status/910SB0171.html (last accessed 11/12/2007); See Exh. AA, Senate Transcript, May 26, 1999, State of Illinois General Assembly, Regular Session, 53rd Legislative Day.

**Adoption of Village Ordinance**

7. On December 11, 2001. The Village of Hazel Crest adopted Ordinance No. 25-2001 pursuant to the statute which tracked the language of the state statute and enabled the chief of police to appoint two deputy chiefs. (Exh. F, Fee Dep., p.20; Exh. G, Jones Dep., pp.61-63; Exh. M, Deft. Dep. Exh. 3)

8. The only requirement under the state statute (65 ILCS 5/10-2.1-4) and village ordinance (Ordinance No. 25-2001) is that the selection of deputy chief be made from among the sworn ranks of police officers with at least five years experience with the department. It was an exempt position which was not required to be filled through the testing process of the Board of Fire and Police Commissioners. The appointment served at the discretion of the chief of police, meaning that the deputy chief could be removed at any time by the chief of police. (Exh. F, Fee Dep., p. 21-23, 26; Exh. A, Murray Dep., p. 30-31; Exh. D, Peers Dep., p. 103-104; Exh. L, Deft. Dep. Exh. 1; Exh. M, Deft. Dep. Exh. 3; Exh. B, Nelson Dep., p. 27)

9. In Nelson's view, no patrol officer could ever be selected for the position of deputy chief. He agreed that this interpretation would render meaningless the statute and ordinance that allowed a chief to select from among any rank of patrol officer. (Exh. B, Nelson Dep., p. 51-52)

**Position Description**

10. A position description for the position of deputy chief was proposed by Chief Peter Fee and adopted in 2001. It provided in part that, in the absence of the chief of police, the deputy chief had full authority, direct charge and control of the department.

It also contained certain "Desired Minimum Qualifications.":

> DESIRED MINIMUM QUALIFICATIONS
> Education and Experience
> (A)   High school diploma or equivalent; and
> (B)   Completion of the State Basic Training Academy or equivalent academy; and
> (C)   Minimum of five (5) years work experience as a police officer for the Hazel Crest Police Department; and
> (D)   Minimum of two (2) years work experience as a police sergeant or higher; and
> (E)   Although not required, desirable to possess at least a bachelor's degree in law enforcement or related curriculum from an accredited college or university.

It also contained certain "Special Requirements":

> SPECIAL REQUIREMENTS
> (A)   Must possess a valid State of illinois Driver's License.
> (B)   Basic Law Enforcement Training (or Police· Officer Standards and Training) certification or equivalent.
> (C)   No felony convictions.
> (D)   Successful completion of a police supervision course of instruction from an accredited lllinois police academy. In addition, it is desirable that the individual have completed a mid-level police management course, such as the F.B.I. National Academy or the Northwestern University School of Staff and Command.
> (E)   Working knowledge of modem police and business information management systems.

Finally, it provided:

> SELECTION GUIDELINES
> The Deputy Police Chief is an exempt rank appointed by the Chief of Police. The Deputy Chief serves at the discretion of the Chief of Police and, if removed, shall revert to the rank held immediately prior to the appointment to the Deputy Police Chief position.
>
> The duties listed above are intended only as illustrations of the various types of work that may be performed. The omission of specific statements of duties does not exclude them from the position if the work is similar, related or a logical assignment to the position.

> The job description does not constitute an employment agreement between the employer and employee and is subject to change by the employer as the needs of the employer and requirements of the job change.

(Exh. A, Murray Dep., pp. 36-37; Exh. N, Deft. Dep. Exh. 4)

11. The position description was not part of the village ordinance relating to the deputy chief position. If the chief wanted to amend the position description, he was free to do so. (Exh. F, Fee Dep., pp. 34-35, 72; Exh. A, Murray Dep., p. 37)

**First Deputy Chiefs**

12. Richard Lenz and Gary Jones, appointed by Chief Fee in January, 2002, were the first two deputy chiefs in the history of the Village of Hazel Crest under the new statute and ordinance. (Exh. G, Jones Dep., pp.16, 62); (Exh. F, Fee Dep., p. 28, 36-37) They were the only officers to serve as deputy chiefs before Gary Jones selected Gary Gentzle and Malcolm White as his deputy chiefs on July 12 , 2005. (Exh. A, Murray Dep., pp. 42-43)

13. There was no "process" for the selection of the deputy chiefs before. There was no need to post the position. Both the statute and the village ordinance clearly provided that the selections for deputy chief were exclusively Chief Fee's to make. (Exh. F, Fee Dep., p. 34-35; Exh. A, Murray Dep., pp. 61-62)

**December 2004, EEO Plan**

14. According to the EEO plan prepared by Chief Fee in 2004, based upon the 2000 Census, the demographic make-up of the Village of Hazel Crest was 19.5% white and 76.3% black. (Exh. F, Fee Dep., p. 69; Exh. P, Deft. Dep. Exh. 8)

15. It is a requirement of the Committee on Accreditation of Law Enforcement Agencies ("CALEA"), that the department have a goal to have the police department reflect the makeup of the community. The goals of the police department, as set forth by Chief Fee in 2004, in the department's annual EEO statement, documented the department's goal to have the police department, and specifically the supervisory ranks, match the demographics of the community it served. (Exh. F, Fee Dep., p. 68-70) Chief Fee believed that the goals and objectives of having the department and supervisory ranks match the racial makeup of the village of Hazel Crest was the right thing to do. They were not wrong or improper. (Exh. F, Fee Dep., p. 70; Exh. A, Murray Dep., p. 48) Garofalo and Peers also believed in that goal of the department. (Exh. C, Garofalo Dep., p. 69-70; Exh. D, Peers Dep. p. 204) He agreed that if the person was otherwise qualified, Chief Jones could take that desired goal into account in making his selection for deputy chief. (Exh. C, Garofalo Dep., p. 70) Diversity within the department was a laudable goal. (Exh. B, Nelson Dep., p. 47-48)

**Gary Jones**

16. Gary Jones graduated from Thornwood High School in South Holland, Illinois in 1974. He has a Bachelor's degree from Governor State University and a Masters degree in Criminal Justice and Corrections from Chicago State University, which he received in 1997. He

completed the Northwestern School Police Staff and Command Course in 1994. (Exh. G, Jones Dep, pp. 7-8)

17. Gary Jones was hired as a patrolman with the Village of Hazel Crest on May 1, 1978. (Exh. G, Jones Dep., P. 12.) He was appointed through the Board of Fire and Police Commissioners. (Exh. G, Jones Dep., p. 12. )

18. Gary Jones was promoted to detective sergeant in 1991. He held that position until 1998 when he was appointed by Chief Peter Fee Administrative Sergeant in charge of the accreditation process. (Exh. G, Jones Dep., p.14 ) That became his full-time job. (Jones Dep., p. 195)

19. Before Jones, there were two other individuals who held the position of Administrative Sergeant responsible for accreditation: Sergeant Andrew Gammill and Sergeant Michael MacLeod. Gary Jones served as Sergeant in charge of accreditation until he was named Deputy Chief in 2001 or 2002 by Chief Peter Fee. (Exh. G, Jones Dep., pp.14-15.) (Exh. G, Jones Dep., p. 202)

**Robert Donaldson**

20. In April of 2005, Mayor Robert Donaldson was elected Village President or Mayor of the Village of Hazel Crest. He defeated William Browne who was the first African American elected Village President in Hazel Crest. (Exh. H, Donaldson Dep., p. 21, 28, 32, 35)

21. Robert Donaldson and the other newly elected trustees were sworn in at the first Village Board Meeting in May 2005. (Exh. G, Jones Dep., p. 23)

22. Gary Jones knew who Robert Donaldson was but had no relationship with him before he was elected. He was not involved in Robert Donaldson's campaign for Mayor of Hazel Crest. (Exh. G, Jones Dep., pp.19-20)

**Robert Palmer**

23. Robert Palmer is the Village Manager for the Village of Hazel Crest, a position he has held since October 1, 1991. (Exh. E, Palmer Dep., p. 4-5) As Village Manager, he has the authority and responsibility to appoiint the chief of police and other department heads. (Exh. E, Palmer Dep., p. 22, 23, 134)

24. Peter Fee recommended that Gary Jones be appointed chief of police after Fee retired. (Exh. E, Palmer Dep., p. 23) As the sole remaining deputy chief after Gary Lenz retired, Gary Jones was the logical choice for the role of acting chief and later chief of police. Palmer thought that Jones was well qualified for the position. His former supervisors had all spoken highly of him in his 20 plus years of service with the department. He was satisfied with Jones leadership ability to run the department. (Exh. E, Palmer Dep., p. 27-28; 43-44)

**Malcolm White**

25. At the time of his selection as deputy chief, Malcolm White had been a Hazel Crest police officer for approximately eight years. Before that he had worked with the Harvey Police Department as a full time officer and tactical officer. Gary Jones knew that he had probably seen more grassroots police work in Harvey than most Hazel Crest officers had seen in their entire careers.

### April 2005 Election

**Fee and Lenz Resign**
26. After Donaldson was elected, Chief Fee retired, telling Gary Jones that he had his time in and that it was time to move on. He also said he did not want to work for the new regime or the new Mayor. Chief Fee felt that Mayor Donaldson had an intimidating personality. (Exh. G, Jones Dep., p. 21; Exh. F, Fee Dep., 42-43)

27. Chief Fee believed that it made economic sense for him to leave as he could draw his pension and make a salary working somewhere else. (Exh. F, Fee Dep., 44-45) Deputy Chief Richard Lenz retired within days of Chief Fee. (Exh. F, Fee Dep., p. 46)

### Jones appointed "Acting" Chief

28. Jones had told Chief Fee many times before that he was interested in a position of chief of police. Chief Fee said it would be his recommendation that Gary Jones get that job. Jones never made it a secret to Chief Fee that he wanted to be the next chief. (Exh. G, Jones Dep., p.22-23); (Exh. F, Fee Dep. p.47-48)

29. On April 22, 2005, Village Manager, Robert Palmer named Gary Jones acting chief of police and disseminated a memo to all Village employees confirming that appointment. (Exh. G, Jones Dep., pp.23, 81; Exh. O, Deft. Exh. 6) Bob Palmer asked that Jones not make any appointments until Jones was made the chief of police on a "non-acting" basis. (Exh. G, Jones Dep., p.26) Gary Jones' understanding was that it would be fruitless for him to appoint someone to a position as part of his management team when he was not yet the manager. (Exh. G, Jones Dep., p.27)

30. Bob Palmer's appointment of Gary Jones as acting Chief of Police did not require Village Board approval. (Exh. G, Jones Dep., p. 85; Exh. E, Palmer Dep., p.22 ) Jones did not appear before the board for any reason prior to his appointment as acting Chief of Police. (Exh. G, Jones Dep., p.85) Gary Jones had no conversation with Mayor Donaldson prior to being named acting chief of police. (Exh. G, Jones Dep., p.86)

**Two Deputy Chief Positions Open**
31. As a result of Gary Jones being named acting chief, the two deputy chief positions were vacant (Jones was made chief and Lenz retired). (Exh. G, Jones Dep., p.28)

32. While he served as acting chief, Gary Jones performed the duties of the two deputy chief positions. (Exh. G, Jones Dep., p.28)

## Jones Appointed Chief

33. On June 28, 2005, Gary Jones was appointed Chief of Police by Robert Palmer on a non-acting or "permanent" basis. (Exh. G, Jones Dep., p.24)

34. After Jones was appointed permanent Chief of Police on June 28, 2005, he told Robert Palmer that he would advise him of his selections for the two deputy chief positions. (Jones Dep., p.33. Robert Palmer never told Jones that he had to use any type of methodology to make his selections. As far as Jones was concerned he had free reign to appoint the two deputy chiefs in any manner he felt appropriate. (Exh. G, Jones Dep., p.34)

35. As chief of police, Gary Jones believed he had the lawful authority under the state statute and village ordinance to select his management team based on who he felt would best serve the village and the residents based upon Jones' perception of the needs of the village. He believed that was the reason the law gave the chief of police the discretion to make his choice from among any of the sworn ranks of officers. Because of this law suit, he questioned whether it was in fact his decision to make, since he was now being second-guessed on his choice by the plaintiffs. (Exh. G, Jones Dep., p.479)

## Jones' Decision to Appoint His Deputy Chiefs

36. Even before he was selected as chief of police, Gary Jones felt that if he ever was selected chief, he would reinstate the position of administrative sergeant that he once held and would transfer the duties for accreditation from the deputy chief position to the administrative sergeant position as he felt it was a more efficient way to run the department. (Exh. G, Jones Dep., p. 169-170, 216) Jones discussed his desire to re-establish the administrative sergeant position with former chief Peter Fee and Sgt. Peers. (Exh. F, Fee Dep., p. 56)

37. Sgt Peers told Gary Jones that Patrick Murray would be a good candidate for administrative sergeant handling accreditation. (Exh. D, Peers Dep., p. 58) Peter Fee felt that Murray would be a good accreditation manager. (Exh. F, Fee Dep., p. 105) Chief Jones told Peter Fee that he felt Murray would be good for the position. Former Chief Fee concurred, indicating he believed Murray was a very intelligent individual. (Exh. F, Fee Dep., p. 57)

38. Jones asked Murray if he would accept the position of administrative sergeant and assume the responsibility for accreditation and he accepted. (Exh. G, Jones Dep., p. 172; Exh. A, Murray dep., p. 136)

39. Chief Jones never told Patrick Murray that he wanted him to serve as Deputy Chief of Support Services. (Exh. G, Jones Dep., p.171)

**White and Gentzle Selected**

40. Gary Gentzle and Malcolm White were the third and fourth officers (after Jones and Lenz) to serve in the position of deputy chief since the position was created in 2001. (Exh. G, Jones Dep., p. 34 )

41. Malcolm White, an African American, and Gary Gentzle, a Caucasion, were appointed Deputy Chiefs by Gary Jones on July 12, 2004. There was no selection process for Gary Jones appointment of Gary Gentzle and Malcolm White to the Deputy Chief positions. (Exh. G, Jones Dep., pp.24 25-26; Exh. A, Murray Dep., p. 61-62)

42. In making his decision to appoint Malcolm White and Gary Gentzle as his deputy chiefs, Gary Jones did not take performance evaluations into account. (Exh. G, Jones Dep., p.43) He did not review anyone's personnel files. (Exh. G, Jones Dep., p. 44) He read the State law and Village ordinance and Position Description before making his selections as deputy chief. Once he decided who he was going to present as a candidate for each of the positions, he discussed it with Village Manager, Bob Palmer. (Exh. G, Jones Dep., p. 45)

43. Chief Jones discussed with Village Manager Bob Palmer the fact that the job description for deputy chief called for the candidate to hold the position of sergeant for a minimum of two years as a preferred requirement. He told Mr. Palmer that while he was aware of the statement in the Position Description, he was also aware of the state law which stated that the promotion could come from any rank in the police department. (Exh. G, Jones Dep., pp.47-48) He believes that Mr. Palmer checked with the Village attorney, John Murphey, and was ultimately told that the decision would be fine and that he could move forward with it. (Exh. G, Jones Dep., p.48) Chief Jones believed that he had the authority to appoint Malcolm White as Deputy Chief. (Exh. G, Jones Dep., p.50) As when Jones and Lenz were first appointed deputy chiefs by Peter Fee, Chief Jones did not conduct any formal interview of either Gary Gentzel or Malcolm White. (Exh. G, Jones Dep., p.51)

### Malcolm White's Selection

44. Before Malcolm White was appointed deputy chief on July 12, 2005, no African American had ever held a supervisory position in the history of the Hazel Crest Police Department. (Exh. G, Jones Dep., pp.24, 154 )

45. Gary Jones made the decision to appoint Malcolm White as Deputy Chief after he had been sworn in as the permanent Chief on June 28, 2005. (Exh. G, Jones Dep., pp.25-26)

46. Gary Jones chose Malcolm White for the position of Deputy Chief of Support Services. His reasons for choosing Malcolm White as deputy chief included, his proven ability as a leader. While he had not held a supervisory rank, he did serve and act as a shift supervisor when a sergeant was not working the shift. He had prior experience as a tactical officer with the Village of Harvey Police Department, which Chief Jones believed gave him good "grass roots" experience. He had been selected by both black and white officers to be their union representative. He saw that White represented both the white and black officers equally. He knew of Malcolm White's abilities through the union negotiations over the patrol officers' union contract with the village. Jones was a management representative and White represented the union in the union contract negotiations. Gary Jones was impressed with the way White presented himself during that process. (Exh. G, Jones Dep., pp. 41, 42 )

47. Malcolm White did not hold the rank of a supervisor but performed as a supervisor when the Sergeants were not on their shift and he was delegated shift commander and supervised the other officers on the shift. (Exh. G, Jones Dep., p.41; Exh. C, Garofalo Dep., p. 65-66) It appeared to Sgt. Garofalo that he did a good job. (Exh. C, Garofalo Dep., p. 66) Garofalo believed he had the skills to be a good supervisor at some point. (Exh. C, Garofalo Dep., p. 67,68; Exh. U, Deft. Exh. 25) Patrick Murray noted that White performed well for him as shift commander when Murray was absent and rated him a "10" out of "10" in the "Growth Potential" category in an evaluation dated April 11, 2004. (Exh. A, Murray Dep., p. 179-180; Exh. Q, Deft. Dep. Exh. 15; Exh. D, Peers Dep., p.250) In this evaluation of Malcolm White, Patrick Murray specifically commented:

> "Comments: Officer White serves as shift commander in my absence and performs that duty well; brings a wealth of experience to the shift; always looks for a challenge; doesn't hesitate to ask 'why' concerning policy or practice that might be outdated; a creative thinker; often devises ways around red tape; a leader; provides good training to probationary officers; often is asked for advise by his colleagues; excellent candidate for higher positions in the department." (Murray Dep., pp. 182-183; Deft. Dep. Exh. 15)

48. There was nothing that David Nelson observed about Malcolm White's personality, his skills or abilities as a police officer, anything in his character or background that he believed would rule him out from serving in the position of a first-line supervisor. (Exh. B, Nelson Dep., p. 49-50)

49. Jones' appointment of Malcolm White was not made just to reflect the community of Hazel Crest. His entire focus was to present law enforcement services to a community as best he could and to create a management team that in his view was able to perform. (Exh. G, Jones Dep., p. 390)

50. Malcolm White had never been disciplined by the Village of Hazel Crest Police Department when Gary Jones was making his decision. (Exh. I, Jones Affidavit)

51. For different reasons, Chief Jones did not believe that any of the four plaintiffs were what Jones was looking for in filling the second deputy chief position. (Exh. G, Jones Dep., pp.37-38) Chief Jones felt that Malcolm White would be the best person to carry out his mission and the mission of the Hazel Crest Police Department. He felt that White would be the best selection to serve the people of the Village of Hazel Crest as Jones' second deputy chief. Jones wanted the department to be better than it had been in the past and, taking all those things into account, felt that Malcolm White gave him the best opportunity to deliver those services in that fashion. (Exh. G, Jones Dep., p.39; Exh. J, Palmer Dep., p. 154, 156, 200-201)

52. Malcolm White's race was something Chief Jones considered, but was not the reason for his selection. Chief Jones knew from speaking with members of the public that the lack of minority representation in the supervisory levels of the police department was a concern.

(Exh. G, Jones Dep., p. 39) He knew the community and the members of the board well and knew that there was a yearning for minority representation at the supervisory level of the police department. (Exh. G, Jones Dep., p. 40)

53. In making his decision, Chief Jones wanted to show the community that he was cognizant of the fact that the Village needed minority representation and where Chief Fee talked about it and listed it as a goal of the department, Chief Jones made it happen, and was proud of that fact. (Exh. G, Jones Dep., p. 252)

54. Patrick Murray conducted the background investigation of Malcolm White when he was hired. In the course of the investigation, Sgt. Murray reported that he had spoken to two of Malcolm White's supervisors at the Village of Harvey where he had been employed as a police officer and examined Malcolm White's personnel files from Harvey. Sgt. Murray reported to Chief Fee that he found no reason not to recommend Malcolm White for hire by the Hazel Crest Police Department. (Exh. K, Murray Resp. to Req. to Admit, par. 1; Exh. W, Deft. Dep. Exh. 51; Exh. F, Fee Dep., pp. 59-60))

55. After he decided he was going to reach down into the patrol ranks, Chief Jones did not consider anyone other than Malcolm White for the position of deputy chief. (Exh. G, Jones Dep., p. 57)

56. When Malcolm White was appointed to the position of Deputy Chief, he did not have two years work experience as a police sergeant or higher as described under the "Desired Minimum Qualifications" section of the position description. (Exh. G, Jones Dep., pp.71-72) However, he had served as acting shift commander. Malcolm White also did not have a Bachelors degree . (Exh. G, Jones Dep., p. 72)

57. Because he felt that none of the sergeants after Gary Gentzle were worthy of selection to the position of deputy chief, Chief Jones had to look at officers who did not meet the "Desired Minimum Requirements" set out in the position description, but met the legal requirements for the position under the state statute and village ordinance.

58. Based on all of these factors, Gary Jones believed that Malcolm White was his best choice for the position of deputy chief. (Exh. G, Jones Dep., p.39 )

**Gentzle Selected**

59. Gary Gentzle had been Gary Jones' clear choice for one of the Deputy Chief positions after Jones became Chief. (Exh. G, Jones Dep., p. 29)

60. Gary Gentzle did not have any college degree at the time Jones appointed him as deputy chief. (Exh. G, Jones Dep., pp. 72-73)

61. Gary Jones selected Gary Gentzle as his second in command as Deputy Chief of Patrol because he trusted him as a partner in working with him as a partner for many years. He

felt that he had a good grip on where Chief Jones was headed with the police department and would carry out his duties as Chief Jones desired. (Exh. G, Jones Dep., p.35) He thought that Gary Gentzle was the most capable and possessed the greatest leadership skills of those he was considering for deputy chief. (Exh. G, Jones Dep., p.36)

62. Gary Gentzle had been a sergeant for more than two years, but like Malcolm White, did not have a college degree. (Exh. G, Jones Dep., pp.72-73)

63. In Chief Jones' mind, none of the four plaintiffs were worthy of being promoted to the deputy chief position. (Exh. G, Jones Dep., p. 253)

## Plaintiffs Not Selected

**Murray**

64. Patrick Murray was the only one of the four plaintiffs who Chief Jones seriously considered capable of filling the deputy chief position. (Exh. G, Jones Dep., p.61)

65. As the Accreditation Manager for the Hazel Crest Police Department and certified Lead Assessor for CALEA for many years, Gary Jones was aware that the police department was not representative of the community and that the Department was under scrutiny from the accreditation individuals on that issue. (Exh. G, Jones Dep., p.40)

66. As of July 12, 2005, Sergeant Murray met all of the "Desired Minimum Qualifications" (Exh. G, Jones Dep., p. 74)

67. Jones did not select Murray for the position of deputy chief because he did not feel that he could trust him. He did not feel that Murray had the best interests of the department in mind. He had previously been told by former Chief Fee that Fee would never put Murray in a position of trust on the department and that even Chief Fee's predecessor, Harold Moore, had felt the same way. Chief Moore had also told Gary Jones the same thing many times. He had to consider all of those issues in deciding who to choose to be the leader of the men and women in the department. In addition to discussing the matter of Nelson's complaint about Murray and Nelson's wife, Jones was aware of Fee's opinion that Murray was for much of his career, anti-establishment or anti-administration and would always go against whatever the administration was doing. (Exh. G, Jones Dep., pp. 160-161, 163-164; Exh. F, Fee Dep., p. 49-53; Exh. E, Palmer Dep., p. 159, 207)

68. The chief of police should look for someone he can place his trust and confidence in, and who is of good character when making his selection. (Exh. C, Garofalo Dep., p. 71; Exh. D, Peers Dep. p. 118-119; Exh. A, Murray Dep., pp. 66-67; Exh. B, Nelson Dep., p. 39) If the chief did not have trust and confidence in an individual, he would be within his rights in not selecting him for the deputy chief position. These were important factors for the chief to take into account in making his decision. (Exh. A, Murray Dep., p. 66; Exh. D, Peers Dep., p. 120; Exh. B, Nelson Dep., p. 41) The chief should be able to take his own goals and objectives into consideration in making his decision. (Exh. B, Nelson Dep., p. 42)

69. Chief Fee had told Gary Jones that Murray had lied to him. (Exh. F, Fee Dep., p. 49-50)

70. Jones was aware of Sgt. Nelson's accusations against Murray, that Murray had interfered in a traffic accident in which Sgt. Nelson was involved and that Nelson believed that Murray had improperly interfered in that investigation because Murray had been coming on to Sgt. Nelson's wife. An internal investigation was conducted by Chief Fee and Gary Jones. Murray was suspended by Fee for three days following the investigation into Nelson's allegations against Murray. (Exh. G, Jones Dep., p.226-229; Exh. F, Fee Dep., p. 50-53)

71. Nelson filed a complaint about statements Murray made to Nelson's wife that Nelson believed were inappropriate. He believed that Murray then retaliated against Nelson for complaining about Murray's statements when Murray took it upon himself to investigate further an accident that Nelson was involved in. Nelson felt that Murray abused his position as a supervisor and that when Murray altered the police report of the accident, he was violating department rules. He believed that Murray was using his position of authority in the department to damage Nelson's reputation within the department. (Exh. B, Nelson Dep., pp. 141-151; Exh. R, Deft. Dep. Exh. 16; Exh. S, Deft. Dep. Exh.17; Exh. T, Deft. Dep. Exh. 18)

72. As Murray moved into a supervisory position, Chief Fee received complaints about his leadership style, where he favored certain officers over others. Chief Fee counseled Sgt. Murray about this, but his leadership style never changed in Chief Fee's opinion. The incident with Sgt. Nelson and Sgt. Nelson's wife, reinforced Chief Fee's views about Sgt. Murray to the point that Chief Fee did not feel he was an appropriate candidate to rise to higher levels in the police department. He told Gary Jones this and told him that he would never appoint Sgt. Murray to the position of deputy chief of police. Gary Jones was aware of the incidents involving Sgt. Murray and shared in Chief Fee's sentiments. (Exh. F, Fee Dep., p. 51-52)

73. Chief Fee felt that Sgt. Murray was a very intelligent person, conducted himself well, was very knowledgeable, but never supported Chief Fee or his philosophy of what Chief Fee felt a leader should be. (Exh. F, Fee Dep., p. 52-53) Gary Jones believed that Sgt. Murray did not have the full respect of his fellow officers. (Exh. G, Jones Dep., p. 241)

74. Despite the fact that Sgt. Murray met all of the minimum qualifications for the position of deputy chief and was a very qualified candidate under the position description, Chief Fee would never have selected Sgt. Murray for the position of deputy chief and told Gary Jones that. (Exh. F, Fee Dep., p. 52-53)

75. After he made his selections for deputy chief, Gary Jones asked Murray to be his Administrative Sergeant or Accreditation Manager Sergeant. The position offered a great opportunity to not only travel around the country but it was what worked for Jones in preparing him for his administrative functions in the police department. He believed that it was his involvement with the accreditation process that resulted in his becoming chief of police. It was where he obtained the most knowledge and he thought that that would be a good thing for Murray. When Jones had the ultimate goal of becoming chief, he thought that assuming the Accreditation Manager position would be a good way of putting himself on track to achieve that.

Murray reported directly to Jones. (Exh. G, Jones Dep., p. 172, 193-194, 215-216) Murray enjoyed the accreditation management job. (Exh. A, Murray Dep., p. 136)

**Peers**

76. Peers did not meet all of the desired minimum qualifications of the position description for deputy chief. (Exh. G, Jones Dep., pp.72-73;77)

77. Chief Jones had had a discussion with Sergeant Peers, after he was made acting chief of police, but told Peers that he was not yet in a position to make any assignments. (Exh. D, Peers Dep. p., 38-39, 41, 49, 50)

78. Murray told Peers that Jones had said he was promised a deputy chief's position, but Peers told Murray that that was not what Jones had said. Jones had told Peers that no promises had been made. (Exh. D, Peers Dep., p. 52)

79. As with Malcolm White and Sgt. Gentzle, Sgt. Peers did not have a bachelors degree. (Exh. G, Jones Dep., p.77; Exh. C, Garofalo Dep. p. 55)

80. Sgt. Peers asked to be considered for the Deputy Chief of Patrol position. Chief Jones told him that he had already selected Sgt. Gary Gentzle for the position, but was considering Peers for the Detective Sergeant position. Peers told Chief Jones that if he could not be the Deputy Chief of Patrol, he would rather stay as a patrol sergeant since he would have the most seniority of any officer on the street and could pick his own schedule. Jones did not consider him for any other position based on his comments. He took himself out of the running for deputy chief. (Exh. G, Jones Dep., p. 411, 415-416)

81. In addition, Jones did not believe that Peers had the respect of the men he supervised and worked with. He had a reputation as having a volatile personality and was given the nickname "Hank" by one of the plaintiffs – a reference to the Jim Carey character by that name from the movie, "Me, Myself and Irene." It was an ongoing joke. Each and everyone of the plaintiffs referred to him as "Hank." He would be angry one time, then act differently on others. Comments were made by Sgt. Peers fellow officers that he was an unstable individual. (Exh. G, Jones Dep., p. 385-386; Exh. C, Garofalo Dep., p. 80-82 )

82. Chief Jones felt that Malcolm White's qualifications were superior for Jones' particular needs. Malcolm White was the clear leader among the patrol ranks. He was selected by his fellow officers, both black and white, to be their union representative. He exhibited qualities of leadership in that capacity, and he thought that those leadership qualities exceeded those of Sergeant Peers. Jones did not believe that any of Peers fellow officers recognized him as a leader. (Exh. G, Jones Dep., p. 381-382) Malcolm White spoke well of his officers and made sure that their interests were represented. (Exh. G, Jones Dep., p. 384)

83. Chief Jones thought that Malcolm White was better suited to perform the duties of deputy chief than was Mark Peers. He thought that keeping in mind the personnel of the Hazel Crest Police Department, the make up of the community, and how he felt his management team would best represent the Village in law enforcement services, that Malcolm White and Deputy

Chief Gentzle would be the best choices for his management team. (Exh. G, Jones Dep., p. 384; Exh. E, Palmer Dep., p. 154) He thought that Malcolm White exhibited the better leadership skills. He thought that he commanded the respect of his subordinates to a greater extent than did Mark Peers. (Exh. G, Jones Dep., p. 389)

      84.    On March 24, 2006, Sgt. Peers issued a memo to Chief Jones advising that he had applied for and had accepted a lateral position of Lieutenant with the Country Club Hills Police Department. (Exh. D, Peers Dep., p. 75-76; Exh. V, Deft. Exh. 48)

      85.    The four plaintiffs claim that they were better educated than Malcolm White and met more of the "desired minimum qualifications" set forth in the position description for the position of deputy chief of police. (Murray Complaint, (06 C 1372) Doc. No. 1, ¶¶56, 62-63, 75; , Peers Complaint, (06 C 3735) Doc. No. 1, ¶¶61-73, 79; Nelson Complaint, (06 C 3675) Doc. No. 1, ¶¶61-69, 74; Garofalo Complaint, (06 C 3674) Doc. No. 1, ¶¶63-68, 87)

**Nelson**

      86.    Sergeant Nelson did not possess all of the Desired Minimum Qualifications of the position description as he did not have a minimum of two years work experience as a police Sergeant. (Exh. G, Jones Dep., p.74-75; Exh. C, Garofalo Dep., p. 54; Exh. B, Nelson Dep., p.33) Neither he nor Malcolm White had yet completed a mid-level police management course. (Exh. G, Jones Dep., pp.76-77)

      87.    Former Chief Peter Fee and Sgt. Murray did not feel Sgt. Nelson was qualified for the position of deputy chief as he did not meet the desired minimum qualification of two years as a supervisor. (Exh. F, Fee Dep. pp. 99-100; Exh. A, Murray Dep., p. 78)

      88.    Chief Jones felt that Sgt. Nelson was lackadaisical in his attitude and did not have the command presence he was looking for in a deputy chief. He wanted someone stronger in the position and did not see that in Sgt. Nelson. Sgt. Nelson felt it was easier to be someone's friend than their boss or disciplinarian and that was not what Chief Jones was looking for in making his selection. Chief Jones wanted someone stronger who possessed leadership skills beyond question and he did not see that in Sgt. Nelson. For that reason, he exercised his discretion and did not choose Sgt. Nelson for the position. (Exh. A, Jones Dep., p. 417)

**Garofalo**

      89.    Garofalo never spoke to Jones about selections for deputy chief before Jones made his selections. (Exh. C, Garofalo Dep., p. 93-94)

      90.    Garofalo had never asked to be considered for the position of deputy chief. (Exh. C, Garofalo Dep., p. 98) In fact, Garofalo was upset that he was not considered for the position of detective sergeant when Nelson's selection was announced. He had previously told Jones he wanted to be considered for the detective sergeant position. (Exh. C, Garofalo Dep., p. 100, 101) Jones told him that he had selected Nelson for the detective sergeant position because he wasn't sure if he could depend upon Garofalo, since Garofalo had asked to be released from detectives in 1998 for personal reasons and had previously voluntarily resigned from the SSERT (South Suburban Emergency Response) team. (Exh. C, Garofalo Dep., p. 103-104)

91. Chief Jones felt that Sgt. Michael Garofalo did not have the leadership skills or decision making skills necessary to hold the deputy chief of support services position. Garofalo did not exhibit to Jones the ability to make decisions. This opinion was based on the comments of others, including former chief Peter Fee, as well as Chief Jones' own mental impressions of Garofalo from working with him in the detective division. (Exh. G, Jones Dep., p. 307-308) Garofalo was not someone he wanted to appoint as one of his deputy chiefs. (Exh. G, Jones Dep., p. 313)

92. Chief Fee told Gary Jones, when discussing possible candidates for deputy chief, that Sgt. Garofalo, while he had the qualifications and did extremely well when competing for the positin of sergeant, in actuality, in every day practice, was very hesitant to make a decision. He often had to go to Deputy Chief Lenz to get assurance that he decision he was making was correct. Chief Fee told Gary Jones that he felt Garofalo had shortcomings in the area of decision making. Chief Jones concurred with him. (Exh. F, Fee Dep., pp. 54-55)

93. When the chief, as the decision-maker is making the decision who to select as his deputy chief, he has to make that assessment before the person is in the job. He has to make a judgment call as to whether or not the person selected would be able to demonstrate strong leadership qualities to use them to motivate employees and would be able to effectively delegate responsibilities to first-line supervisors. (Exh. C, Garofalo Dep., p. 62)

94. Garofalo believes that he is the most qualified for the position of deputy chief as between the four plaintiffs. (Exh. C, Garofalo Dep., p. 174)

**Murray, Peers and Garofalo's Retirement from Hazel Crest P.D.**

95. On December 1, 2005, at age 50, Patrick Murray announced his retirement from the Hazel Crest Police Department. (Exh. A, Murray Dep., p. 7)

96. He currently draws a pension from the Village in the amount of $52,000. He is employed as a senior law enforcement instructor at the Northwest Indiana Law Enforcement Academy in Gary, Indiana. at a salary of $43,000, in addition to his full pension. (Exh. A, Murray Dep. pp. 5, 10, 11)

97. On March 31, 2006, Mark Peers voluntarily retired from the Village of Hazel Crest. He draws a pension from Hazel Crest of roughly $37,000 per year. Upon retirement, he took a position as Commander with the neighboring City of Country Club Hills Police Department at a higher rate of pay. He he started at $82,500 per year, in addition to his full pension from the Village of Hazel Crest. He currently earns $85,200 per year. He makes as much now as a deputy chief at Hazel Crest. Because of overtime, he would have been able to earn even more as a patrol sergeant – up to $15,000 to $30,000 more. (Exh. D, Peers dep. p. 10, 16, 20, 206, 209, 210, 212, 213)

98. Michael Garofalo resigned and took a position as a police officer with the Village of Winnetka effective June 5, 2006, earning in excess of $72,000 per year and overtime of

$5,000 to $6,000 per year. (Exh. C, Garofalo dep p. 7-10) While he will continue to work as an officer for Winnetka, he plans to begin drawing his pension of roughly $36,000 per year from Hazel Crest on September 27, 2009, when he turns age 50. (Exh. C, Garofalo dep p. 11) After eight years, he will be eligible for a pension from Winnetka as well. (Exh. C, Garofalo dep p. 11-12)

99. David Nelson has remained within the Hazel Crest Police Department and continues to hold the position of sergeant. Sergeants are paid overtime at Hazel Crest, while deputy chiefs are paid a straight salary and do not receive overtime. Nelson earned $80,648 as a sergeant in 2005. He earned "close to" $100,000 in 2006. (Exh. B, Nelson Dep. p. 154; Exh. G, Jones Dep., p. 18) In both 2005 and 2006, Nelson earned more as a sergeant than he would have as deputy chief. (Exh. B, Nelson Dep., p. 162)

100. When appointed deputy chief in 2005, Malcolm White's salary was $72, 133.16, inclusive of longevity pay. (Exh. J, Palmer Affidavit)