IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | | | |
|---|---|---|---|---|
| PATRICK MURRAY, MICHAEL GAROFALO, & MARK PEERS | ) ) ) | | | |
| | ) | No. | 06 C 1372, | (Murray) |
| Plaintiff, | ) | No. | 06 C 3735, | (Peers) |
| | ) | No. | 06 C 3674, | (Garofalo) |
| v. | ) | | | |
| | ) | Judge William T. Hart | | |
| VILLAGE OF HAZEL CREST, et al. | ) | | | |
| | ) | Magistrate Judge Morton Denlow | | |
| Defendants. | ) | | | |

## PLAINTIFFS' COMBINED RESPONSE
## TO DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT

NOW COMES, Plaintiffs, Patrick Murray, Michael Garofalo, and Mark Peers through their respective attorneys, in combined response to Defendant Village of Hazel Crest's Partial Motion for Summary Judgment and states as follows:

### STATEMENT OF FACTS

Plaintiffs have set forth material facts in support of this Memorandum in Opposition to Defendant's Motion for Summary Judgment in their Local Rule 56.1(b)(3)(B) statement and in their response to Defendants' Statement of Facts, and incorporate those facts as if fully stated herein.[1]

### SUMMARY JUDGMENT STANDARD

"Because summary judgment is such an extreme remedy, it should not be granted unless the non-moving party cannot prevail under any discernable circumstances." Bonds v. Coca Cola, 806 F.2d 1324, 1331 (7th Cir. 1986). The facts in this case must be "[c]onstrued as favorably to the plaintiffs as the record permits, which is the proper standard when evaluating the grant of summary judgment in favor of the defendant…" Hunt v. City of Markham, 219 F.3d 649, 652 (7th Cir. 2000). Any doubt as to the existence of a material fact is to be resolved against the moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986). "Because credibility and

---

[1] Plaintiffs submitted their Statement of Additional Material Facts pursuant to Local Rule 56.1(b)(3)(B). Citation to those facts will be indicated in this memorandum as "PAF". Citations to Defendant's Statement of Facts will be cited as "DSOF". Plaintiffs Response to DSOF will be cited as "PRS".

1

intent are central issues in employment discrimination cases, motions for summary judgment must be approached 'with added rigor.'" Collier v. Budd Co., 66 F.3d 886, 892 (7th Cir. 1995).

## ARGUMENT

Our analysis begins with Chief Justice Roberts' axiomatic statement, "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." Parents Involved in Comm. Schools v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 748 (2007). Defendant's motion for partial summary judgment is only directed against Plaintiff's Title VII claim. Defendant's motion must be denied because material facts in the record support each and every element of a Title VII claim against the Village. At a minimum, those facts are disputed.

### DEFENDANT ENGAGED IN DISPARATE TREATMENT UNDER TITLE VII

Defendants intentionally discriminated against Plaintiffs on the basis of their race - Caucasian. Title VII "prohibits employment discrimination on the basis of race, color, religion, sex or national origin." Ricci v. DeStefano, 129 S.Ct. 2658, 2672 (2009). Title VII protects whites and non-whites. McDonald v. Santa Fe Transp. Co., 427 U.S. 273, 280 (1976).

A defendant is guilty of disparate treatment when it treats the plaintiff "less favorably than others because of the plaintiff's race…" Watson v. Ft. Worth Bank & Trust, 487 U.S. 977, 985-86 (1988). To survive summary judgment "plaintiff need only present evidence of an intent to discriminate which could form the basis for a finding that the [municipality's] proffered reason for" defendant's adverse action was pretextual. Beavers v. Al Baskin Clothing Store, 1987 WL 10960 at *5 (N.D.Ill. 1987); see also Watson, 487 U.S. at 986. "Discrimination is intentional if it is deliberate rather than accidental (i.e. negligent)." Dunn v. Washington County Hosp., 429 F.3d 689, 694 (7th Cir. 2005)(Rovner concurrence and dissent). "Under Title VII, a plaintiff can prove discrimination either by presenting evidence of discrimination (the 'direct method' of proof), or by the McDonnell Douglas burden-shifting approach (the 'indirect method')." Darchak v. City of Chicago Bd. of Educ., 2009 WL 2778227 *5 (7th Cir. Sep. 3, 2009). Defendants' motion for partial summary judgment must be denied because under either the direct or indirect method Defendants intentionally discriminated against the Plaintiffs because of their race – Caucasian.

**I.    There is Direct Evidence of Defendants' Intentional Discrimination.**

"Under the direct method of proof, a plaintiff's claim survives summary judgment if she can demonstrate 'triable issues as to whether discrimination motivated the adverse employment

action.'" (citation omitted) Darchak, 2009 WL 2778227 *5. "Direct evidence generally involves an admission or statement by the decision-maker regarding his discriminatory intent." Palka v. City of Chicago, 2008 WL 3895486 *4 (N.D.Ill. 2008)(Conlon, J.)(excellent discussion of what constitutes direct evidence of discrimination); see e.g. Venters v. City of Delphi, 123 F.3d 956 (7th Cir. 1997)(holding a police chief who called the police station "God's house" and told a dispatcher that she better choose "God's way" or she would be fired is direct evidence); Sheehan v. Donlen Corp., 173 F.3d 1039 (7th Cir. 1999)(holding a supervisor who told a pregnant woman she was being fired so she could spend more time at home with her kids is direct evidence of pregnancy discrimination); Lewis v. School Dist. #70, 523 F.3d 730 (7th Cir. 2008)(holding superintendent's letter stating termination is for excessive absenteeism is direct evidence of FMLA violation); Darchak, *supra* (supervisor calling a Polish employee "stupid Polack", saying that Hispanic students are better than Polish ones, and saying, "if you don't want to do whatever I tell you to do, you can leave my school" is all direct evidence of discrimination under Title VII). This is one of those "rare" cases where the employer actually admits intentionally discriminating against its employees based on their race. See Darchak, *supra*, at *5.

A.   **The Village admits it used "race" as a consideration.**

The Village pretty much concedes it discriminated against the Plaintiffs. During his deposition, Jones admitted using race as a "consideration" when he selected Malcolm White to be deputy chief. (PMF 1) Jones told Garofalo that he is the "wrong color" to be deputy chief. (PMF 2) Richard Lenz testified, "I was aware that Gary Jones announced that he was planning to appoint Gary Gentzle and Patrick Murray to the two deputy chief openings…" (PRS 67, PMF 23) Lenz (Jones' colleague), Cynthia Tolliver (Jones' secretary), and Jack Grady all testified that Jones told them Mayor Donaldson required Jones to promote a black candidate. Donaldson spoke with Jones regarding "diversity." (PRS 34) Then, Jones explained to Peers and Murray that Donaldson wanted "black representation at all levels in the police department - front line, supervisory and command." (PMF 18) Jones told a trusted friend, Gary Gentzle, Pat Murray was not getting the job because Donaldson "needs someone black to be deputy chief." (PRS 34) Jones told Murray, Rogers, and Garofalo that Donaldson's order to promote White bothered Jones because he was unqualified for the job. (PRS 34)

Of course, Jones may have been more conflicted because Jones knew if he did not promote White he would not remain police chief under Donaldson. Grady testified, "The Mayor

3

wants Malcolm promoted. Gary said that he was told, if I do, everything's fine. If I don't, my job's in jeopardy." (PRS 67) Jones intimated the same concern to Peers and Nelson. (PRS 67) Lenz further testified, "Jones told me, 'Things have changed. I have to promote Malcolm (White) to deputy chief. The Mayor told me to." (PRS 34) Jones said, "that he had to promote a black in the department to the position of deputy chief in order for him to become chief of police." (PRS 34)

**B.  Hazel Crest engaged in illegal racial balancing.**

Hazel Crest engaged in illegal racial balancing. "Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation." Freeman v. Pitts, 503 U.S. 467, 494 (1992). "[E]vidence that an employer followed an affirmative action plan in taking a challenged adverse employment action may constitute direct evidence of unlawful discrimination." Humphries v. Pulaski County Special Sch. Dist., 2009 WL 2778309 *4 (8th Cir. Sep. 3, 2009); see also Rudin v. Lincoln Land Comm. Coll., 420 F.3d 712, 722 (7th Cir. 2005). "Without some other justification, this express race-based decisionmaking violates Title VII's command that employers cannot take adverse employment actions because of an individual's race." Ricci, 129 S.Ct. at 2673. "If the employer defends by asserting that it acted pursuant to a valid affirmative action plan, the question then becomes whether the affirmative action plan is valid under Title VII and the Equal Protection Clause." Humphries, at *4.

"We put the burden on state actors to demonstrate that their race-based policies are justified." Parents Involved in Comm. Schools v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 744 (2007). "To pursue the concept of racial entitlement - even for the most admirable and benign of purposes - is to reinforce and preserve for future mischief the way of thinking that produced race slavery, race privilege and race hatred. In the eyes of government, we are just one race here. It is American." Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 239 (1995)(Scalia, J. concurring). It is well established:

> "that all government action based on race-a *group* classification long recognized as 'in most circumstances irrelevant and therefore prohibited,' [internal citation omitted] should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed. These ideas have long been central to this Court's understanding of equal protection, and holding 'benign' state and federal race considerations to different standards does not square with them."

(emphasis in original) Adarand, 515 U.S. at 227; see also Seattle Sch. Dist., 551 U.S. at 720.

"Individuals who have been wronged by unlawful race discrimination should be made whole; but under our Constitution there can be no such thing as either a creditor or a debtor race. That concept is foreign to the Constitution's focus upon the individual…" Id. at 239 (Scalia, J. concurring). As such, "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." Adarand, 515 U.S. at 227. "In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling government interests." Id.

To prevail in justifying its use of race-based decision-making, the Village must prove it aimed to achieve a "compelling government interest"; and its "diversity" plan was "narrowly tailored." The Village cannot meet this burden.

**1. The Village does not meet its burden of proving it had a compelling government interest when it discriminated against the Plaintiffs.**

Hazel Crest had no "compelling government interest" to discriminate. Courts have found three "compelling interests" that may justify use of race-based preferences: (1) "diversity" in the educational context; (2) remedying past discrimination; and (3) compelling public safety concerns. None of these rationales apply to this case.

**a. Hazel Crest's dedication to "diversity" is a sham.**

The Village's claim that it is endeavoring to achieve diversity in its police department is a sham. The Supreme Court holds, "If petitioner's purpose is to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin, such a preferential purpose must be rejected not as insubstantial but as facially invalid. Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids." Regents of the Univ. of California v. Bakke, 438 U.S. 265, 307 (1978). The Court, in Bakke, held "diversity" can be a compelling government interest in the educational context. 438 U.S. at 311-12. However, the Court held, "The diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element. Id. at 315. Put plainly, to be considered a compelling government interest "diversity" must be aimed at reaching a goal that is something more than "racial balancing."

Defendant's "diversity" plan fails because "diversity" is only a compelling government interest in the educational context. See Lomack v. City of Newark, 463 F.3d 303, 309-10 (3d Cir. 2006)(holding that a goal of "diversity" is not a compelling interest for fire departments). There is no evidence having a diverse police force yields any benefit for Hazel Crest, let alone that it is needed to satisfy a compelling need. (PMF 5) However, even if this Court were to find diversity, as it is defined by Bakke, is applicable to police agencies, Hazel Crest still falls well short of its burden to prove it was working to achieve a compelling government need.

The Village repeatedly proclaimed its dedication to "diversity." Jones boasted he was "proud" when he put into action the Village's racial "diversity" plan. (PRS 53) After White was promoted, Donaldson said, "When we took over, I mentioned to the chief [Jones] that we had to have diversity. Now we have diversity." (Ex. 31). Upon promoting a black sergeant, in July 2005, Jones stated, "Now we will have diversity at every level of the police department." (Ex. 33). Donaldson further stated, "It's important that supervisory levels of our departments reflect the diversity of the community." (Pl.Ex. 33, 34). After his first 100 days as mayor, Donaldson proclaimed, "We have started to achieve diversity in the upper ranks of the Police Department with the appointment of Malcolm White as the first African-American Deputy Chief…" During a board meeting, Donaldson said, "Thank you, Chief [referring to Jones], for keeping your promise for diversity in the Police Department." (PMF 3)

The Village does not use the term "diversity" as is intended by the Court in Bakke. Instead, the Village uses the term "diversity" as code for "black." (PMF 4) When asked about what "diversity" means, Jones stated, "I think we are talking about race." (PMF 4) When asked other than African-Americans and whites, "what other groups would be part of your definition of 'diversity'", Donaldson responded, "Hispanics, Asians, native Americans, Indians, Alaskans." (PMF 4) Village Manager Palmer joined in his colleagues' narrow definition of "diversity." (PMF 4) Jones, Donaldson, and Palmer all agreed that when using the term "diversity" it means the racial makeup of the department should reflect the racial makeup of the community. (PMF 4)

"This working backward to achieve a particular type of racial balance, rather than working forward from some demonstration of the level of diversity that provides the purported benefits, is a fatal flaw under our existing precedent." "We have many times over reaffirmed that racial balance is not to be achieved for its own sake." [internal citations omitted] Seattle Sch. Dist., 551 U.S. at 729. "The principle that racial balancing is not permitted is one of substance,

not semantics. Racial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" Id. at 732.

### b. Hazel Crest has no proven history of race discrimination.

Hazel Crest has no proven history of race discrimination. (PMF 5) Nonetheless, Defendants rely upon Petit v. City of Chicago, 352 F.3d 1111 (7th Cir. 2003) for the apparent proposition that it is always acceptable for any community with a racially mixed populace to use race as a consideration when making employment decisions. However, that is not what Petit holds, and this case is nothing like Petit.

Defendant relies on the portion of Petit stating, there is a "compelling need for diversity in a large metropolitan police force charged with protecting a racially and ethnically divided major city in America." However, In Petit, the defendant, City of Chicago, introduced extensive evidence documenting the benefits of "diversity" and the need to remedy past discrimination. The trial court in Petit benefitted from hearing several experts who testified about the benefits that the City's affirmative action program would yield. Id. at 1114-1115. Some of the benefits touted by the experts were increased trust in the minority community and "changing the attitudes of officers." Id. at 1115.

Defendant seems to miss the premium the trial court in Petit put on having evidence to support its claim. In order to justify using racial preferences, "the government must show real evidence of past discrimination and cannot rely on conjecture." Majeske v. City of Chicago, 218 F.3d 816, 820 (7th Cir. 2000). "Racial discrimination cannot survive without compelling evidence; even highly plausible speculation will not do." McNamara v. City of Chicago, 138 F.3d 1219, 1222 (7th Cir. 1998).

In this case, there is no evidence that Hazel Crest has a history of racial discrimination against blacks. (PMF 5) There is no evidence that Hazel Crest has a "large metropolitan police force" or is "racially divided." Chief Jones testified that no studies have been performed regarding the need for racial diversity or its effects. Commission on Accreditation for Law Enforcement Agencies ("CALEA") found Hazel Crest's police department to be compliant with all minority-recruiting standards. (PRS 14) In this case, there is no evidence that Hazel Crest's citizens had a distrust of the police. In fact, Donaldson testified, during his only interaction with a white police officer in Hazel Crest, the officer acted appropriately and professionally. (PMF 19) The personnel files of all of the Plaintiffs indicate members of the public appreciated and

valued their services and professionalism. (Ex. 43a, b, c) Put plainly, there is no evidence of any "need" for racial balancing in Hazel Crest.

In sum, significant evidence demonstrates: (1) it is undisputed Gary Jones admits he used race as a "consideration" when he promoted White; (2) after Jones told Murray he was going to be named deputy chief, the Mayor told Jones he had to appoint a black deputy chief, preferably Malcolm White; and (3) these acts were taken to meet the Village's stated "diversity" goal, which can only be met by having the police department (at all levels) reflect the racial composition of Hazel Crest (i.e. 76.3% black). This is illegal.

        **c.     There are no "compelling public safety concerns" requiring race-based promotions.**

"Many courts, however, including our own, have at least left open a small window for forms of discrimination that are supported by compelling public safety concerns, such as affirmative action in the staffing of police departments and correctional institutions." Reynolds v. City of Chicago, 296 F.3d 524, 530 (7th Cir. 2002). However, for the reasons stated above, the Defendants have not produced any evidence of their "compelling public safety concerns" that required promoting an unqualified black officer over several tremendously qualified white officers. In fact, since promoting Malcolm White, Hazel Crest has lost its CALEA accreditation and had a massive exodus of experienced officers.

        **2.     The Village's racial diversity plan is not narrowly tailored.**

The Village's racial balancing plan is unconstitutional because it is not narrowly tailored. This case is almost identical to Koski v. Gainer, 1995 WL 599052 (1995)(Leinenweber, J.). In Koski, the court considered the validity of the Illinois State Police's ("ISP") affirmative action plan that was approved by the EEOC. Id. at *12. Like Hazel Crest, the "ultimate goal of the ISP's affirmative action plan, from its creation until 1990, was to have a percentage of black and Hispanic ISP troopers match those found in the state's population." Id. Like Hazel Crest, "The ISP conceded that its overarching goal was 'to *ensure* that minorities… are represented at the same percentage within the department's sworn work force as they are represented in the external population.'"(emphasis and ellipsis in original). Id. at 16. The percentages in Koski were "from the complete population of blacks and Hispanics in Illinois rather than from groups limited to a certain age category." Id. ISP's approach indicates "an utter lack of any tailoring." Id. The Koski court granted summary judgment in favor of the plaintiffs. Id. at *17.

In this case, the Village has taken no steps to narrowly tailor its approach. In fact, it used almost the exact same approach as the defendant, ISP, did in Koski. The Village sought to have the department reflect the racial makeup of Hazel Crest's general population. (PMF 4) Like the ISP of the 1980's, Hazel Crest did not measure itself against a population that controlled for age or other requisite criteria (e.g. felony convictions, age, and educational level) in determining the percentage of minority population that it should measure its police department against. (PMF 4) Furthermore, it is important to note, the impermissible ISP plan at least aimed at benefitting all minorities. Hazel Crest solely aimed at benefiting blacks. Since Hazel Crest's plan was even more broadly tailored than the ISP plan, it is not narrowly tailored. Thus, it is illegal.

## II. Plaintiff Establishes a Genuine Issue of Material Fact Via the Indirect Method of the Village's Intentional Discrimination.

In addition to a genuine issue of material fact that Defendant is guilty via the direct method, Plaintiffs are also able to demonstrate a genuine issue of material fact via the indirect method as stated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

### A. Plaintiffs Make a *Prima Facie* Case of Race Discrimination.

Under McDonnell Douglas, Plaintiffs must make out a *prima facie* case by showing: 1) they are members of a protected class, 2) they were qualified for the position of deputy chief, 3) they were rejected, and 4) the position was filled by someone not in the protected class. "The denial of a promotion is an adverse employment action." Hunt, 219 F.3d at 654 (citing Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). A modified standard governs "reverse discrimination" cases. Hague v. Thompson Distribution Co., 436 F.3d 816, 822 (7th Cir. 2006)(cited by Defendant). White plaintiffs must show background circumstances demonstrating their cases are no different than cases where members of a racial minority challenge a decision favoring non-minority employees. Id. To defeat summary judgment on the *prima facie* case, the Plaintiffs need only show there is a issue of material fact regarding these elements. O'Neal v. City of New Albany, 293 F.3d 998, 1003 (7th Cir. 2002). If an inference of improper motive can be drawn, there must be a trial. Loyd v. Phillips Bros., Inc., 25 F.3d 518, 522 (7th Cir. 1994)

#### 1. There are "background circumstances" necessary to move forward with a reverse discrimination analysis.

The modified standard is not to be used "in a constricting fashion" and in no way precludes any plaintiff with direct evidence of discrimination from bringing a claim. Mills v.

9

Health Care Service Corporation, 171 F.3d 450, 457 (7th Cir. 1999)(cited by Defendant); see e.g. Gordon v. City of Harvey, 2009 WL 2163233 (N.D.Ill. 2009)(holding white officer passed over for promotion by black officers constitutes adequate background circumstances). The record contains many pieces of background evidence including the election of a black mayor who insisted the police department instantly achieve "diversity" (PMF 7) and a municipal policy that called for the police department to reflect the racial makeup of Hazel Crest (a predominantly black community) in hiring and promotions. (PMF 4) Again, Jones admits race was a "consideration" he used when promoting White over the far better qualified Plaintiffs. (PMF 1) Hazel Crest concedes that the desire or pressure on the part of the new administration to see blacks appointed or promoted within the police department is part of the "background circumstances" the modified McDonnell Douglas paradigm calls for in this case.

### 2. There are material facts supporting Plaintiffs' *prima facie* case.

As a threshold matter, Hazel Crest argues that the state statute creating the position of deputy chief gave Chief Jones unfettered discretion to choose anyone he wanted for the job - as long as they served as an officer in Hazel Crest for at least five years. Defendants claim Plaintiffs were not qualified because only Jones can decide who is qualified. Meaning, Defendant claims Malcolm White, the black patrol officer who was appointed to the job is only qualified because Jones selected him -- a truly circular argument. That might be so, if the Village had not published objective qualifications for deputy chief in a job description.

Plaintiffs met all of the "Desired Minimum Qualifications" established by the Village's job description. (PRS 74, PMF 28, 31, 32) Malcolm White did not meet these minimum qualifications. (PMF 36) Particularly, White did not have a "Minimum of two (2) years work experience as a police sergeant or higher." (PMF 34) The job description states, it is "desirable" for individuals to possess at least a bachelor's degree. (Ex. 49) White has no such degree. (PMF 36) Murray and Garofalo have bachelors and masters degrees. (Ex. 43) Plaintiffs each met all of the "Special Requirements" for holding the position of deputy chief. (PRS 74, PMF 28) Again, White falls short of the Plaintiffs. Unlike Plaintiffs, White was not a graduate of the required supervision course (i.e. Northwestern School of Staff and Command). (PMF 36)

Plaintiffs are white, they sought promotion to the position of deputy chief (and were each qualified for that position), they were rejected and the job went to a significantly less qualified black patrol officer. Plaintiffs clearly make out their prima facie case.

10

### B. Defendant's Stated Reasons for Promoting White are Pretextual.

The burden under McDonnell Douglas now shifts to Hazel Crest to advance a legitimate (non-discriminatory) reason for choosing White over the plaintiffs. To meet its burden of production, Hazel Crest claims: 1) all three of the plaintiffs were "unpromotable," and 2) it was necessary to promote "a black" to a supervisory position to make the police department more "diverse" to reflect the racial makeup of Hazel Crest.

Specifically, Chief Jones testified that he did not promote Patrick Murray because he did not trust him and because Nelson complained about Murray allegedly inappropriately reacting to Nelson's complaints about Murray talking to his wife. (PRS 67) Jones testified that he did not promote Mark Peers because Peers did not have the respect of the men he worked with, had a reputation as having a volatile personality, and "took himself out of the running" for the deputy chief position by insisting that if he could not have the deputy chief of patrol position, he did not want any other position. (PRS 81) Jones testified that he did not promote Garofalo because he felt that Garofalo lacked leadership and decision-making skills. (PRS 91) Each of these reasons is refuted by the Plaintiffs.

Hazel Crest's promotion of White is pretextual. Pretext means a lie or a phony reason for an action. O'Neal, 293 F.3d at 1005. A *prima facie* case, combined with sufficient evidence to find the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000); see also Giacoletto v. Amax Zinc Co., 954 F.2d 424, 457-458 (7th Cir. 1992). In this case, Plaintiffs present testimony from at least seven people who testify that Jones told them he promoted White because he is black.

Courts are not required to credit a defendants' subjective recounting of qualifications. Reeves, 530 U.S. at 150-151; Perfetti v. The First National Bank of Chicago, 950 F.2d 449, 450-451 (7th Cir. 1991)(verdict for plaintiff where employer relied on a subjective judgment about interpersonal skills to explain a poorly documented employment decision). Nonetheless, the Village asks the Court to take Jones at his word, lamely falling back on the contention that Jones could choose anyone he wanted as long as he complied with the minimal requirement of the statute. Not only does that argument defy common sense, it ignores the Village's own procedures and published objective standards. A number of aspects of Jones' decision to promote White combine to demonstrate that it was merely a pretext for discrimination. Each is discussed below.

### 1. Hazel Crest shifted reasons for promoting White.

An employer's change in explanation for the adverse employment action is evidence of pretext. Stalter v. Wal-Mart Stores, Inc., 195 F.3d 285 (7th Cir. 1999); Zaccagnini, 338 F.3d 672 (7th Cir. 2002)

In the instant case, Hazel Crest offered several explanations for the decision to promote Malcolm White. Initially, Jones told several people in the police department that he had chosen Patrick Murray for the position of deputy chief. (PRS 36) After Jones became chief, he declared on several occasions that Mayor Donaldson had forced him to select a black deputy chief. (PRS 46) Jones' third reason was that all of the plaintiffs were "unpromotable" and he had to ignore the position requirements and reach down to the patrol ranks. (PRS 67, 81, 91) Jones later provided a fourth reason—he wanted to racially balance the police department, making it match the racial makeup of the community. (PMF 4)

This case is similar to Nanda v. Bd. of Trust's of the Univ. of Ill., 2004 WL 432472 (N.D.Ill. 2004) where the plaintiff's supervisor discriminated against her on the basis of her sex, race, and national origin by terminating her. The supervisor at first refused to tell the plaintiff and a colleague why he was recommending her termination and said there was no reason. Later, he said he had changed his mind and wanted to take the department in a new research direction. Nanda, at *22. The supervisor also belatedly claimed Nanda had numerous performance deficiencies that supported her discharge, but he never sent her any memos in that regard and there was no documented evidence of such deficiencies. Id.

Here, the record indicates that the "reasons" Jones now offers up were never articulated prior to this litigation. There is no evidence in the record that Jones, who was asked repeatedly about why he promoted White, ever described any of the plaintiffs as unpromotable. Also, Jones never documented any of the criticisms he had of the Plaintiffs. (Ex. 43) Jones was far from deciding that Patrick Murray was untrustworthy. (Ex. 43) In fact, Jones had selected him as his first choice for the position. (PRS 46) Jones said he did not select Garofalo because he was the "wrong color." With regard to Peers' alleged "volatility", Jones admitted it never was more than "joking" and "banter." (PRS 81).

Nor is there any evidence that Jones ever mentioned White's alleged qualifications as a basis for his decision. There is also evidence in the record that Jones promoted White solely because of his race at the Mayor's insistence. (PRS 46) In fact, White admitted, he was

"surprised" when Jones asked him to serve as deputy chief. Which makes sense because when Jones had an opportunity to pick a detective, he did not choose White.

### 2. The Village's lies present an issue of fact that its decision was pretextual.

Because a fact-finder may infer discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes summary judgment. <u>Zaccagnini v. Chas. Levy Circulating Co.</u>, 338 F.3d 672, 676 (7th Cir. 2003). The record contains numerous documented lies on the part of Jones and Donaldson. Jones' first lie is about his initial motivation for trying to achieve "diversity."

On July 26, 2005, Jones said the police department was "scrutinized in the past by the CALEA and was found to be lacking in diversity at command levels." (PRS 65) This is a lie. CALEA's Final Report stated, "The assessment team found the Hazel Crest Police Department to be in compliance with all applicable standards." (PRS 65) Jones, an experienced CALEA evaluator, testified he did not know if CALEA has a policy regarding promotions of minorities. Jones further contradicted his first statement, when CALEA found that Hazel Crest had fully complied with its diversity requirements. (PRS 65)

Jones and Donaldson also lied about their commitment to diversity, as evidenced by their penchant for gratuitous racial slurs. It is likely that a jury will conclude a person who, like Jones, refers to his African-American colleagues and superiors as "niggers" and "jigaboos" is not "proud" of and dedicated to the seemingly altruistic goal of diversity. (PMF 15) Also, it is likely a jury will disbelieve Donaldson's alleged dedication to "diversity" when he refers to his department chair at Governors State University, Henry Lowenstein, as his "Jew chair" and a "God damn white bastard." (PMF 14) Donaldson goes as far as claiming that the "whites" are to blame for all of the discrimination he has suffered throughout his life. (PMF 6)

Jones and/or Donaldson also lied about Jones' "promise" to the Mayor to increase "diversity." The mayor publicly thanked Jones for promising diversity. However, at his deposition, Jones claimed, "I don't know what he's talking about." (PMF 8)

Jones also lied about telling numerous people in the department that he planned to make Murray deputy chief of support services. (PRS 67) Five witnesses contradict this lie. (PRS 67) Jones lied about whether he had ever voiced any concern about Garofalo's decision-making to Richard Lenz. (Ex. 14: Lenz Aff.) Lenz denies that ever happened. (Ex. 14: Lenz Aff.) Jones

13

also lied when he said that Peers told him that he wasn't interested in any other job than Deputy Chief of Patrol. (Ex. 50: Peers Aff.).

Most entertainingly, Donaldson lied about knowing Malcolm White prior to his inauguration. (PMF 46) Perhaps Donaldson should examine his own campaign materials where White features prominently with Donaldson in a photograph and by name. (PMF 46, Ex. 27). Donaldson also lied about not knowing that he did not have the power to choose a police chief and a deputy chief. Like the plaintiff in Ramos v. Schaumburg/Oakbrook Marriott Hotels, Inc., 2003 WL 22682355 (N.D.Ill. 2003), Plaintiffs point to specific facts that call into question [Jones' and Donaldson's] credibility, which is sufficient to warrant denial of summary judgment. Id. at *9

### 3. The Village's ignoring of its internal procedures and qualifications presents a material issue of fact that its decision was pretextual.

Defendants argue, based upon Jones' vastly impeached testimony, "subjective" requirements are not *per se* evidence of pretext. In other cases that might be true. Defendant believes that an employer can ignore its internally developed objective criteria for promotion, instead relying upon solely subjective criteria (including race). The Supreme Court disagrees.

> "We do not question an employer's affirmative efforts to ensure that all groups have a fair opportunity to apply for promotions and to participate in the process by which promotions will be made. But once that process has been established and employers have made clear their selection criteria, they may not then invalidate the test results, thus upsetting an employee's legitimate expectation not to be judged on the basis of race." Ricci, 129 S.Ct. at 2677.

An employer's failure to follow its own internal employment procedures can constitute evidence of pretext. Rudin, 420 F.3d at 727, citing Giacoletto, 954 F.2d at 427. In this case, the Village utterly ignored its published personnel manual and position description for deputy chief.

At all times relevant to this case, the Village had a published position description establishing the qualifications to be considered by the Village when appointing a deputy police chief. (See Pl.Ex. 49). The Village's Personnel Manual (Pl.Ex. 18) states, "Appointments and promotions to positions within the Village shall be on the basis of merit and seniority, and including the following: (a) training, education, experience, and physical ability as it pertains to the essential functions of that particular position; (b) oral interview; (c) examination or other demonstration test." Neither was followed.

Again, this case's similarity to Nanda is glaring. In recommending termination of Dr. Nanda's contract, her supervisor failed to consult with the Faculty Advisory Committee and refused to discuss his decision with them. The supervisor admitted that he made his decision unilaterally, frankly acknowledging that he did not follow this procedure because he suspected that the Faculty Advisory Committee would not agree with him. Nanda, *supra* at *21. Failure to follow these internal guidelines led the court to find in favor of the plaintiff. In this case, the record shows that Jones refused to follow the procedure spelled out in the Village's personnel manual for promotions. Jones also refused to take into account the requirements set out in the position description. Like Nanda, this Court should find for the Plaintiffs.

### 4. White's utter lack of qualifications shows pretext.

"A jury may infer pretext from an employer's selection of someone with inferior qualifications to the plaintiff." Rawal v. United Airlines, Inc., 2008 WL 4890169, *14 (N.D.IL 2008); see also LoTurco v. Terminix, 2009 WL 2044343 (S.D.Ind. 2009). In LoTurco, the plaintiff provided "extrinsic proof that his overall sales performance was among the highest in the . . . region. Terminix has not cast any doubt upon the authenticity of this evidence." LoTurco, at *4. The court then cited with approval Gordon v. United Airlines, Inc., 246 F.3d 878, 889 (7th Cir. 2001): "We need not abandon good reason and common sense in assessing an employer's actions… [W]e need not take an employer at its word." Id. Here, Plaintiffs have presented substantial evidence of their considerable qualifications, and Hazel Crest does not challenge this evidence. Additionally, the entire evidence Hazel Crest relies on as to the putative qualifications for deputy chief consists of its own self-serving statements, which a jury would be entitled to reject. Reeves, 530 U.S. at 150-151; Dey v. Colt Construction & Development Co., 28 F.3d 1446, 1459 (7th Cir. 1994). Qualifications evidence may suffice, at least in some circumstances, to show pretext. Ash v. Tyson, 546 U.S. 454, 456 (2006).

Nonetheless, the record demonstrates the chasm between the qualifications of the plaintiffs and those of White is vast. Perdomo v. Browner, 67 F.3d 140, 146 (7th Cir. 1995)("plaintiff's qualifications not only match those of the successful appointees; they may very well exceed them."). All three plaintiffs met the primary requirements for the job. White met none of them. Especially noteworthy is the fact that all three plaintiffs had the requisite first line supervisory experience acquired in several years as sergeants. All three had completed the supervisory training required of sergeants. All three had graduated from the Northwestern

15

University Police Staff and Command School. Clearly under the position description the Plaintiffs are not only better qualified that White, but White is not qualified at all.

That explains why the Village *now* claims it acted illegally when it enacted an ordinance requiring a written position description for Deputy Chief of Police. Defendant claims the Village's ordinance creating the position of deputy police chief, and requiring a position description, is preempted by 65 ILCS 5/10-2.1-4. The Village asserts it acted *ultra vires* because this provision says the chief of police can appoint the deputy chief and that the deputy chief serves at the chief's discretion. In essence, Defendant claims the Village is barred from setting higher standards for its own deputy chiefs of police. However, the Illinois Municipal Code empowers municipalities to set its own employment qualifications higher than state minimums.

In this case, the Village enacted an ordinance creating two deputy chief positions (such an ordinance is essential under the act referenced by Defendant). That same ordinance also amended Art.II, §24-12 (entitled "Offices, Positions") of its Municipal Code to include deputy chief as a position within the police department. Part of the same amendment to §24-12 of the Code requires job descriptions "shall be established" and "filed with the board of fire and police commission…" (Def.Ex. L). There has only been one job (position) description (Pl.Ex. 49) for the position of deputy chief in Hazel Crest. The job description establishes "Desired Minimum Qualifications" and "Special Requirements."

It should be noted, police departments serve as "instrumentalities of the municipal corporation…" not the State. <u>Hernandez v. City of Joliet</u>, 1998 WL 259551, *3 (N.D.Ill. 1998); see also <u>People v. Williams</u>, 910 N.E.2d 1272, 1278 (Ill.App. 1st Dist. 2009)(Ill.App. citation not available). A municipality "has not only the power expressly granted to it, but also those powers 'necessarily implied in or incident to the powers expressly granted, and those essential to the accomplishment of its declared objects and purposes.'" <u>Hunt v. City of Peoria</u>, 30 Ill.2d 230, 231 (1964). As such, an examination of the Illinois Municipal Code is essential.

Sections 5-3-10, 10-401, 11-1-1, and 11-1-2 are most important. First, municipalities, like Hazel Crest, are required to pass an ordinance "defining and prescribing the powers and duties of appointive officers and employees." 65 ILCS 5/5-3-10. Second, "The corporate authorities of any municipality may provide by ordinance in regard to the relation between all municipal officers and employees in respect to each other, the municipality, and the people." 65 ILCS 5/10-4-1. Third, "The corporate authorities of each municipality may pass and enforce all

16

necessary police ordinances." 65 ILCS 5/11-1-1; see also Williams, 910 N.E.2d at 1278. Fourth, "The corporate authorities of each municipality may prescribe any additional duties and powers of the police officers." 65 ILCS 5/11-1-2.

Based upon these sections of the Municipal Code, Illinois courts have granted municipalities wide-ranging power to regulate their own employees. "It seems clear to us that by the above provisions of the Municipal Code, ample authority is conferred upon the city council to prescribe the duties of the police and firemen, and also to assign them to duties in other departments, including adoption of appropriate rules relating thereto." Hunt, 30 Ill.2d at 232 (1964). "'If the council has the power to pass an ordinance, it must have the power to carry it into effect.'" Id. (quoting Sheridan v. Colvin, 78 Ill. 237, 246 (1875)).

"Implied in the Section 10-4-1 grant of general powers respecting employment, is power to the municipalities to regulate the conduct to regulate the conduct of their employee, for their own benefit, and for the benefit of the effective administration of the municipalities business." Redemske v. Vill. of Romeoville, 85 Ill.App.3d 286, 290 (3d Dist. 1980). This power includes the ability to place restrictions and/or conditions on employment. Id. The Village, "as corporate authorities of a municipality, and in the exercise of official discretion, could prescribe duties and powers of all police employed by the [municipality]." Cook County Police Ass'n v. City of Harvey, 8 Ill.App.3d 147, 149 (1st Dist. 1972). "As a municipality, the [municipality] possessed not only the express statutory authority to deal with its policemen but also the authority implicitly necessary for the administration of its police force." Id.

In light of the foregoing, it is clear the position description for deputy chief was an appropriate exercise of authority by the Village. It is also clear that Defendant ignored its own position description when promoting unqualified Malcolm White over the qualified Plaintiffs.

**IV.    There are Material Issues of Fact as to Plaintiffs' Constructive Discharge.**

At the summary judgment stage, plaintiffs need only show that it is a disputed issue of fact as to whether their working conditions were intolerable. Gul-E-Rana Mirza v. The Neiman Marcus Group, Inc., 2009 WL 1285890 *12, n.16 and 17 (N.D.Ill. 2009). In the instant case, Jones' rogue appointment of Malcolm White to Deputy Chief triggered a deterioration in the working conditions in the Hazel Crest police department so pronounced that most of the command staff left within a year -- in some cases accepting an adverse impact on their retirement.    (PMF 17, 40-43) Even Gary Jones departed within a year of appointing White.

17

Jones pointedly told the plaintiffs on more than one occasion that they had no future in Hazel Crest and repeatedly urged them to leave, which they all eventually did.

Defendant Hazel Crest challenges plaintiffs' constructive discharge claim on a single basis. Def. Mem. at p. 23 Hazel Crest overlooks the fact that an employee who can show that his working conditions, from the standpoint of a reasonable person, had become unbearable, using one of two approaches. Dawson v. City of Chicago, 2009 WL 2642480 *12 (N.D.Ill. 2009)(citing EEOC v. Univ. of Chicago Hosp., 276 F.3d 326, 331 (7th Cir. 2002)). Under the first approach, which is the only one Hazel Crest relies on, the plaintiff must demonstrate a discriminatory work environment even more egregious than the high standard for hostile working conditions. Id. Under the second approach, when an employer acts in a manner that communicates to a reasonable employee that he will be terminated, and then the plaintiff resigns, the employer's conduct may amount to a constructive discharge. Id. As was the case in Dawson, Hazel Crest cites no authority showing that other evidence of intolerable working conditions cannot support a constructive discharge claim.

The instant case is very similar to Hunt v. City of Markham, where the Seventh Circuit, after acknowledging Tutman v. WBBM TV, Inc./CBS, Inc., 209 F.3d 1044, 1050 (7th Cir. 2000), reversed a grant of summary judgment for defendant. Hunt, 219 F.3d at 655 The Hunt court considered whether involved a white police officer in a predominantly black community who quit was entitled to argue that constructively discharged to a jury. As Judge Posner wrote, "A person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable." Hunt, 219 F.3d at 655

Plaintiffs have advanced sufficient record evidence to defeat Hazel Crest's motion for partial summary judgment on their constructive discharge claim.

**V.    Defendant's Motion for Summary Judgment is Improper.**

Defendant's motion for summary judgment is improper and should be denied. In Goka v. Bobbitt, the court considered behavior that is similar to that used by the Defendant in this case. 862 F.3d 646 (7th Cir. 1988). In Goka, the Defendants asserted the summary judgment standard requires "that they identify *only* those portions of the record which support their position on summary judgment, although there exists evidence to the contrary of which defendants are

aware. Defendants maintain that the burden of producing such evidence was on [the plaintiff] as the party opposing summary judgment, and that he failed to meet that burden… We do not agree." 862 F.3d at 650. The Goka court explained, "When a party has obtained knowledge through the course of discovery, or otherwise, that a material factual dispute exists and yet proceeds to file a summary judgment motion, in hopes that the opposing party will fail or be unable to meet its burden in responding to the motion, he defeats that purpose; and, more importantly, violates the rules of procedure which govern the conduct of trial, specifically Rule 11." Id. at 650.

In this case, Defendant all but ignores L.R. 56.1 by filing more than 225 statements of fact that counsel, per Rule 11, certified were "undisputed." However, in this case, Defendant made "statements of undisputed fact" that were refuted by as many as five depositions and other documentary evidence. It is absurd to believe that Defendant's counsel, who is an able attorney with many years of experience practicing in State and Federal Court, did not notice this mountain of contradictory evidence. In reality, Defendant, for the most part, submitted an abstract of Jones' testimony.

WHEREFORE, for all the foregoing reasons, the Plaintiffs pray this Honorable Court deny Defendant's motion for partial summary judgment.

Respectfully Submitted,

| | |
|---|---|
| s/ Patricia Rummer | s/ Keith Karlson |
| Law Offices of Patricia Rummer | Richard J. Reimer & Associate |
| 5950-E Lincoln Ave., Ste. 300 | 15 Spinning Wheel Rd., Ste. 310 |
| Lisle, Illinois 60532 | Hinsdale, Illinois 60521 |
| (630) 852-8393 | (630) 654-9547 |
| ARDC No.: 06220436 | ARDC No.: |
| *Attorney for Michael Garofalo* | *Attorney for Patrick Murray* |
| | |
| | s/ Nicola S. Tancredi |
| | Law Offices of Nicola Tancredi |
| | Two North Trans Am Plaza, Ste. 250 |
| | Oakbrook Terrance, Illinois 60181 |
| | (630) 530-0567 |
| | ARDC No.: 2795736 |
| | *Attorney for Mark Peers* |