IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL J. GAROFALO, | No. 06C003674 |
| Plaintiff, | **(CONSOLIDATED WITH 06C001372)** |
| vs. | |
| VILLAGE OF HAZEL CREST; | Judge William T. Hart |
| Defendants. | Magistrate Judge Morton Denlow |

**Defendants' Consolidated Reply Brief in Support of
Defendants' Motion for Summary Judgment and Motion to Dismiss and
Response Brief in Opposition to Plaintiffs' Motion for Summary Judgment**

Now come the Village of Hazel Crest, Gary Jones, Robert Palmer and Robert Donaldson, by and through their attorneys, Langhenry, Gillen, Lundquist & Johnson, LLC, and for their Consolidated Reply Brief in Support of Defendants' Motion for Summary Judgment and Motion to Dismiss and Response Brief in Opposition to Plaintiffs' Motion for Summary Judgment, state as follows:

**I.      Reply in Support of Defendants' Motion for Summary Judgment and Response to
          Plaintiffs' Motion for Summary Judgment**

**Introduction**

Not surprisingly, the plaintiffs have completely failed to address defendants' argument that the decision Gary Jones made to select the two officers he chose for the exempt deputy chief positions, was a personal, individualized, discretionary decision, for which courts afford great deference. Nowhere in their response to defendants' motion for summary judgment, do any of the plaintiff's address the applicability of *Enquist v. Oregon Dept. of Agriculture*, __ U.S. __, 128 S.Ct. 2146 (2008),  *Nanavaty v. City of Indianapolis*, 2001 WL 1781924 (S.D. Ind. Dec. 19, 2001), *Raymond v. City of Chicago*, 183 F.Supp.2d 1060 (N. D. Ill., 2002) or *Underwood v. Waddell*, 743 F.Supp. 1291 (S.D. Ind. 1990), all cases which *do* deal with situations in which an employer had to make individualized assessments in the exercise of discretion, as to which

employee would best serve in the position, so as to enable the supervisor to accomplish the goals he had set.

Instead, the plaintiffs attempt to divert the court's attention from the fact that Illinois law vested Gary Jones with the discretion to choose two deputy chiefs to serve on his staff, to aid him in carrying out the goals and objectives he had for the Hazel Crest police department. Rather than focus on the fact that Gary Jones had a singular decision to make, the plaintiffs have concocted a theory that Jones was acting pursuant to some grand plan to correct decades of discrimination against minorities in Hazel Crest. They repeatedly refer to Hazel Crest's "diversity" plan or "racial balancing plan" when in fact there is no such plan. They have even attempted to morph the Equal Opportunity Action Plan, drafted by Gary Jones' predecessor as part of the department's accreditation process, into Gary Jones' own "institutionalized" plan by which he and the Village plotted to "discriminate." Contrary to plaintiffs' argument that "diversity" first became an issue during the mayoral campaign of Robert Donaldson, the *goal* of achieving racial diversity within the ranks of the police department, was a goal former Chief of Police Peter Fee had in place before Robert Donaldson had declared his candidacy for mayor and before Gary Jones was even considered for the position of Chief of Police.[1]

The law granting Gary Jones as Chief of Police the discretion to choose his deputy chiefs, does not say that he must select the officer with the most education, th most senior officer, nor does it say that he must select an officer from among the supervisory ranks. (DSOF ¶ 5). In fact, the legislature wrote the law specifically to provide that the chief of police could make his selection from among *any* rank of sworn officer, not just the supervisory ranks. (DSOF ¶ 5, 6). The three white plaintiffs (originally four) do not object to the fact that Chief Jones filled one of the two deputy chief positions with a white officer, Gary Gentzle. They object only to the fact that Gary Jones believed that Malcolm White, a black officer, would, in his opinion, make a

---

[1]The baseless nature of this argument is exposed by the fact that it is this same "plan" which the plaintiffs argue was "race-neutral" in setting out the method of recruiting minorities and testing for sergeants. (*See,* Plft. Murray and Garofalo's Joint Mem. in Supp. of MSJ, Doc. No. 128 [Murray]; EOA Plan, Plft. Exh. 21, Sec. IV "Plan")

better deputy chief and be a better candidate to help Jones carry out his goals and objectives than they would.

The plaintiffs try to ignore the fact that it was *Gary Jones'* decision to make, for the reasons he personally felt would be best for his administration and the department. The plaintiffs would have this court take away the chief's ability to choose and place it in the hands of this court or an unnamed jury. Doing so would subject every selection for deputy chief a chief has to make, to second-guessing by the courts or any police officer unhappy that he or she was not chosen.

The bottom line, when it comes down to it, is whether Gary Jones had the freedom and discretion to make his own choice for the position of deputy chief, without being second-guessed by the plaintiffs. Unlike the cases cited by the plaintiffs, which universally deal with "affirmative action plans" and whether they were appropriate under the circumstances, Gary Jones' decision was a personal one for him, and him alone, to make.

Moreover, the plaintiffs would have this court to ignore the fact that they *each* must present evidence that *they* would have been chosen for the position. Gary Jones had problems with each of the plaintiffs, and did not want to chose any of them. (DSOF ¶ 67, 68, 74, 80, 81, 91). The reasons for not selecting the plaintiffs for the position were supported in large part by the views of former chief Peter Fee with whom Gary Jones spoke before making his decision. The undisputed fact is, even if Malcolm White had not been chosen, none of the plaintiffs would have been either.

A. **Jones had the discretion under the law to make his own decision as to who was best qualified to serve as his deputy chiefs.**

It is understandable that the plaintiffs did not address the cases that most strongly support the fact that Chief Jones had the discretion to determine who was best qualified to serve as his deputy chiefs of police – *Engquist*, *Nanavaty*, *Raymond* and *Underwood*, *supra*. They are factually very similar to the instant case and the logic is hard to refute.

In *Engquist*, the plaintiff was an employee of the Oregon Department of Agriculture. She sued when she and another employee, with whom she had had repeated problems, both applied for the same position and she was not selected, despite having greater experience in the relevant field. She alleged that she had been discriminated against on the basis of her sex, race and national origin. *Id.* at 2149. Chief Justice Roberts, writing for the majority, noted that the "government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign, to a significant one when it acts as employer." *Id.* at 2151 (quoting, *Waters v Churchill*, 511 U.S. 661,671 (1994)).

The Court in *Engquist* recognized that in the employment context, some actions taken, "by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments," and in such cases, the rule that people should be treated alike in like circumstances is not violated when one is treated differently, "because treating like individuals differently is an accepted consequence of the discretion granted. *In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.*" *Id.* at 2154. (Emphasis added.)

This is exactly the situation here; a situation which the plaintiffs refuse to recognize. On the one hand Illinois law gives the chief of police complete discretion to choose his own deputies, yet the plaintiffs continue to argue that the chief cannot exercise that discretion, but instead *must* choose one of them. Gary Jones exercised his discretion in choosing Malcolm White and set out legitimate reasons for not wanting to select the plaintiffs. Those reasons cannot simply be brushed aside without undermining the discretion given to him as chief of police by the state of Illinois. 65 ILCS 5/10-2.1-4. The Court noted in *Engquist* that "[i]t is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized." *Id.* Accordingly, it was proper for Gary Jones to take into account whether he could put Murray in a position of trust as deputy chief. It was proper for him to take into account whether Garofalo could make decisions under pressure and it was proper for him to take into

account Peers' personality and whether he commanded the respect of the other officers. The Court in *Engquist* stated:

> "[E]mployment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify. As Engquist herself points out, "[u]nlike the zoning official, the public employer often must take into account the individual personalities and interpersonal relationships of employees in the workplace. The close relationship between the employer and employee, and the varied needs and interests involved in the employment context, mean that considerations such as concerns over personality conflicts that would be unreasonable as grounds for 'arm's-length' government decisions ( *e.g.,* zoning, licensing) may well justify different treatment of a public employee."

These are the very things Gary Jones took into account in making his selection for deputy chief.

*Nanavaty v. City of Indianapolis,* 2001 WL 1781924 (S.D.Ind. 2001) is also strikingly similar to the case at hand. There the plaintiff, as here, alleged that the city discriminated against him when the chief of police appointed other employees to the position of "major" instead of him. There, as here, the selections for major were exempt, appointed positions outside the typical merit promotion process, made at the discretion of the chief. "In other words, the majors hold leadership positions in which the chief of police can appoint those officers in whom he has confidence to carry out his policies" and in whom "the chief is entitled to expect confidence and support." *Id.* at *11. Where, as here, the chief did not believe he had the trust and support of the plaintiff, he was free to choose an officer for the position "in whom he had greater confidence than he had in [the plaintiff]." *Id.* at 14.

In  *Raymond v. City of Chicago*, 183 F.Supp.2d 1060, 1064 (N. D. Ill., 2002) the Superintendent of Police for the City of Chicago had discretion to appoint officers to exempt positions. In making his decision, he considered:

> "their integrity, character, morals, and values. He also considered the officers' background in the Department, particularly any actions the officers had taken to improve Department operational procedures. Additionally, [he] looked at how the officers interacted with young police officers as well as with citizens. He focused particularly upon which officers he considered to be team players and whether the officers were able to carry out the mission of the Department." *Id.*

The court held that the superintendent acted properly when he refused to promote the plaintiff to one of the exempt positions as he did not feel she was qualified for the promotion because:

> "(1) he did not believe that she shared his vision of the Department; (2) she did not have the necessary skills and expertise; (3) he did not consider her to be a team player; (4) he did not believe that she had the demeanor to interact with other officers and the command staff; (5) he did not believe that she had mentored and tutored young officers; and (6) he did not have sufficient confidence in [the plaintiff]." *Id.* at 1074.

It was for similar reasons that Gary Jones did not believe the plaintiffs were "promotable." The court in *Raymond*, held these reasons were legitimate and non-discriminatory. *Id.*

*Underwood v. Waddell*, 743 F.Supp. 1291 (S.D.Ind. 1990) recognized the dangers of undermining the discretion of a sheriff in his choice for the position of chief deputy. In that case, the chief deputy was recognized as being the sheriff's right hand man and confidante. *Id.* at 1297. In finding that the sheriff had the discretion to fire the individual chosen for first deputy (as well as hire him), the court noted that "to rule otherwise would force sheriffs to retain a chief deputy, a position that is obviously intended to be one of great confidence, even when that deputy's behavior has destroyed that trust." *Id.* at 1298. Accepting the plaintiffs' argument here, would effect the same result – the chief of police would be forced to select, not the individual in whom he had the most trust and confidence, but someone such as Patrick Murray, whom even the former chief of police had declared, would never be placed in a position of trust. (DSOF ¶ 67)

The law gave Gary Jones the discretion to utilize his own judgment to select the officer who he felt would be best for the position of deputy chief. The plaintiffs cannot take that discretion from him.

**B.**     **Plaintiffs would never have been chosen for Deputy Chief position.**

Each of the plaintiffs ignores the fact that Gary Jones had legitimate reasons for not wanting to select them for the position. None can show that he would have been chosen had Malcolm White not.

1.      **Murray**

Patrick Murray contends that this court should focus on his "qualifications" and his education and that these are the true qualities that any chief should look at when deciding if he was deputy chief material. He ignores the fact that even the chief of police before Gary Jones, Peter J. Fee, would never have chosen Murray for the position of deputy chief. (DSOF ¶ 67, 72, 74). Murray contends that whether Gary Jones felt or believed that Murray was not qualified to serve as his deputy should not matter and that it really is not up to Jones to decide who he wants as his deputy – Murray's "qualifications" trump all and this court should install him to his rightful position as deputy chief of police in the Village of Hazel Crest. With all due respect, what Gary Jones and Peter Fee felt about Murray as a person *does* matter. Listen to former chief Peter Fee and Gary Jones discuss Patrick Murray in their own words:

"Q.   Do you recall at some point having a conversations with Gary Jones wherein you told him that if it were up to you or your position with respect to Pat Murray, he would not hold [a] position of trust within your administration?

A.   Yes."

(Defs' Ex. F, Fee Dep. p. 49; DSOF ¶ 67)

* * *

"I recall that he lied to me." (Defs' Ex. F, Fee Dep. p. 50:8; DSOF ¶ 69)

* * *

"[A]s Sergeant Murray assumed positions of greater leadership within the department, first line supervision as a sergeant, I did receive complaints over the years about his method of leadership or supervision.  It was diametrically opposed to my concept of leadership."  (Defs' Ex. F, Fee Dep. p. 50:20 to 50:25; DSOF ¶ 72, 73)

* * *

"Q.   And he [Nelson] also charged that Patrick Murray was having -- coming onto his wife, for lack of a better phrase?

A.   Yes.  He and his wife -- he being David Nelson -- made that complaint to me and I interviewed David Nelson and his wife Hannah about that.

Q.   You said that you had over the years gotten complaints about Patrick Murray, about his leadership style or leadership techniques.  Can you tell me what complaints you received?

A.   Basically playing favorites.  Giving, you know, certain officers that he favored better assignments and unduly focusing and -- I don't know if you'd call it disciplining -- but

just dealing unfairly with his subordinates. I had received complaints over the years. I had counseled him several times about that. But his -- his leadership style in my estimation had not changed. And in fact, the incident from 2002 or 2003 [Nelson's complaint] just reinforced that I did not feel that he was an appropriate candidate to rise to higher levels, you know, if it were up to me.

Q. And did you tell Gary Jones that?

A. Yes.

Q. Did you tell him that he -- you would never have appointed him as a deputy chief?

A. I believe I said that, yes.

Q. Was -- strike that. Did you -- did you tell Gary Jones any of the reasons why you felt Patrick Murray could not be -- would not be your choice for deputy chief?

A. Yes. He was aware of these instances. He – I believe he shared my sentiments and my beliefs."

(Defs' Ex. F, Fee Dep. p. 51:11 to 52:17; DSOF ¶ 70, 72)


Gary Jones testified:

"Q. Did you have an opinion at the time as to whether or not Patrick Murray was a truthful person?

A. I did.

Q. What was that opinion?

* * *

A. I think that there were times that I was aware of throughout his career where maybe he wasn't so truthful." (Defs' Ex.___, Jones Dep., p. 158; DSAF ¶ 5)

* * *

"A. Well, probably the biggest moment of distruth that I think came from Sergeant Murray was his response and dealing with the situation where he was accused of making inappropriate advances to Sergeant Nelson's wife.

Q. Okay. We are aware of that one. What is the next one, if there are any?

A. Well, that's huge." (Defs' Ex. G, Jones Dep., p. 160; DSAF ¶ 6)

* * *

"A. I had been told by my predecessor Peter Fee that Sergeant Murray was not a person to be considered for a position of trust. He never really expounded on that. But he said that as long as he was the Chief, that a position of trust would not go to Sergeant Murray.

Q. When did he tell you that?

A. He told me that in April.

Q. Of 2005?

A.   That's correct.  In April 2005, after the election was over and he decided that he was leaving, he told me that Pat Murray was not a person to be trusted in that capacity, that he would deny it if I ever -- if ever called to testify to it; but that was, in fact, the case. He also told me that had long been the opinion of even his predecessor Harold Moore, who has also said the very same thing to me many times throughout my life. So I had to consider those issues with regard to my own credibility in selecting somebody who I was choosing to be the leader of men and women of the police department." (Defs' Ex.G, Jones Dep, p.160-61; DSOF ¶ 67).

* * *

"Q.   Okay.  Did Chief Fee tell you why you should not trust Patrick Murray?

A.   Well, we discussed the matter with Sergeant Nelson and Sergeant Nelson's wife. Again, you have -- I hate to keep saying how we are such a small little community and everybody knows everybody's business, but it's true.  And there are many occasions upon which without being able to articulate specifics where Fee was of the opinion that Sergeant Murray was for much of his career anti-establishment, anti-administration, that [he] would always do whatever it was that he could to go against what the administration was doing. That was the picture that was painted for me.

Q.   Is this what Fee told you?

A.   Yes.        (Defs' Ex. G, Jones Dep., p. 163; DSOF ¶ 67).

One of the goals Jones had for the department when he became chief was to garner the respect of the police officers, black and white, the village board and the community.  (DSAF ¶ 8).  He felt that Murray had lost the respect of the officers.  (DSAF ¶ 7).  So, despite his contention, there were good, valid, non-pretextual reasons Gary Jones had for not selecting Patrick Murray for the one remaining position of deputy chief.

## 1.    Garofalo

As to Michael Garofalo, Peter Fee testified:

"Q.   Did you have a discussion with Gary Jones about any of the other sergeants and their qualities or potential to be deputy chief?

A.   I recall we discussed one of the other sergeants.  That would have been Michael Garofalo." (Defs' Ex. F, Fee Dep., p. 53; DSOF ¶ 92).

* * *

"Q.   What do you recall discussing with Gary Jones about Michael Garofalo?

A.   Actually, it was regarding -- again, he had -- he had the qualifications.  He performed extremely well when he was competing for the position of police

sergeant. I remember that he was the -- the top choice of the assessors when they did an assessment center for the position of police sergeant. Yet in actuality in everyday practice Sergeant Garofalo was very hesitant to make a meaningful decision. He often had -- had to go to usually his supervisor, which would have been Deputy Chief Lenz -- in most cases that's who he'd go to -- to get assurance the decision that he was making -- sometimes it was just a purely administrative decision -- was the right thing to do. And I felt and I discussed with -- with Gary Jones that again, very qualified person, very -- conducted himself well in some instances. But his shortcomings again would be in the area of decision making ability." (Defs' Ex. F, Fee Dep., p. 54; DSOF ¶ 92).

Gary Jones testified:

"A.     What I was looking for in a deputy chief was someone who I believed possessed the skills of leadership. It was my belief that Michael Garofalo lacked that skill. And that he had an inability to make decisions. I needed somebody who could be a decision-maker, who was a proven leader, who had, in fact, shown that leadership in the police department, and that's why Michael Garofalo was not considered by myself.

Q.     Tell me what you based your belief on that Michael Garofalo did not have leadership abilities?

A.     He did not exhibit to me the ability to make decisions. He -- I had on many occasions heard from his officers that reported to him and from his fellow workers that upon occasion he was unable to make decisions while working on the street. There was some question." (Defs' Ex. G, Jones Dep., pp. 306-307; DSOF ¶ 91).

Again, Gary Jones had valid reasons for not selecting Garofalo for the one remaining position of deputy chief.

### 2.     Peers

Likewise, Gary Jones had good reasons for not selecting Mark Peers for the position and choosing Malcolm White instead. Gary Jones testified:

"Q.     And could you give us a detailed understanding of how Officer White's qualifications met your needs better than Sergeant Peers'? What need was it that Officer White met better than Sergeant Peers could have?

A.     Well, as I testified at the previous deposition, Malcolm White was the clear leader among the patrol ranks. He was selected by the fellow officers, both black and white, to be their union representative in the Village for the union for the

police officers. He exhibits qualities of leadership in that capacity, and I thought that those leadership qualities exceeded that of Sergeant Peers.

Q. And in what specific aspect of leadership did White exhibit superior to that of Sergeant Peers?

A. Well, specifically, I didn't get support, I didn't recognize any support for Sergeant Peers by his fellow officers that exhibited his ability to be a good leader. I didn't recognize that he had come to the forefront as a leader in any particular aspect as I had seen in Malcolm White in his representation of the officers while they obtained their first union contract; and subsequent to that union contract being ratified, his leadership abilities in representing his fellow officers, I didn't see that." (Defs' Ex. G, Jones Dep., 382-383; DSAF ¶ 10).

As demonstrated above, Gary Jones had good reasons for not selecting any of the plaintiffs and he had good reasons for selecting Malcolm White instead. His decision should not be tossed aside because of some feeling on the plaintiffs' part that they were "better qualified." Failing to grant summary judgment for the defendants in this case would open the door for every slighted employee to contest the chief's selection for deputy chief. The determination of who was best qualified to serve as Chief Jones' second-in-command was a decision that Gary Jones, and Jones alone, was vested with the discretion to make.

**C.    There was no "Plan."**

**1.    There was a decision, not a plan.**

Plaintiffs' analysis as to how the "village's affirmative action plan" fails to meet "strict scrutiny", is completely irrelevant. The cases cited by plaintiffs are cases where the defendants developed specific plans, often complex, often involving multiple selections over periods of years, in which they were admittedly trying to correct for wrongs done to minorities in the past: *Hayes v. North State Law Enforcement Officers Ass'n*, 10 F.3d 207, 210, 212 (4th Cir.1993) (City used an "explicit racial preference" in its comprehensive scheme to promote officers to rank of sergeant and conceded that three of four black officers promoted "would not have been promoted except for their race") (Pltf. Mem. in Supp. of Mo. for Summ. Judg., pp. 10-11); *Wessman v. Gittens*, 160 F.3d 790, 793 (1st Cir. 1998) (plaintiffs challenged admission to Boston schools

based upon School Committee's adoption of "Option N50" which allocated a percentage of admissions based upon "flexible racial/ethnic guidelines.") (Pltf. Mem. in Supp. of Mo. for Summ. Judg., p. 12); *City of Richmond v. J.A. Croson Co.* 109 S.Ct. 706 (1989) (bidder challenged city's minority set-aside program) (Pltf. Mem. in Supp. of Mo. for Summ. Judg., pp. 11-13); *Alexander v. City of Milwaukee*, 474 F.3d 437, 441 (7th Cir. 2007) (seventeen plaintiffs challenged a series of 41 promotions of officers by a fire and police commission from the rank of lieutenant to captain that occurred over a six year period) (Pltf. Mem. in Supp. of Mo. for Summ. Judg., p. 14); *Janowiak v. Corporate City of South Bend*, 836 F.2d 1034, 1035 (1987) (plaintiff challenged application of affirmative action plan adopted by city and developed by Minority Recruitment Task Force) (Pltf. Mem. in Supp. of Mo. for Summ. Judg., p. 15); *Koski v. Gainer*, 1995 WL 599052 , *1 (N.D.Ill. 1995) (class of plaintiffs challenged affirmative action plan adopted by the Illinois State Police) (Pltf. Mem. in Supp. of Mo. for Summ. Judg., p. 15).

While there may have been wrongs done to minorities in employment in Hazel Crest in the past, that was not the reason Jones selected Malcolm White. Was the lack of black supervisors something he was aware of? Certainly. Was the fact that the population of Hazel Crest was nearly 80% black something Jones was aware of? Certainly. But to say that Jones implemented an "unlawful discrimination plan" which fails the Supreme Court's "strict scrutiny" analysis, which fails to show a "compelling need to discriminate" supported by "statistical evidence" and "expert testimony," all things the cases cited by plaintiffs speak to, is completely unfounded.

Gary Jones made a personal decision as to who he felt would best serve in *one* position – that of his deputy chief. He did not implement a "plan."

Plaintiffs assert, "Defendants claim they are allowed to discriminate because they were pursuing 'diversity.'" (Pltf. Mem. in Supp. of Mo. for Summ. Judg., p. 9) The fact that the plaintiffs have to stoop to making claims never remotely made by the defendants, belies their misplaced logic. So it is clear: the defendants have never claimed that they were "allowed to

discriminate" because they were "pursuing diversity." The defendants have never claimed they were "allowed to discriminate" because they had a "plan" to correct the past wrongs of discrimination against minorities in Hazel Crest. It is much more simple than that: Jones had to select two officers for the positions of deputy chief of patrol and deputy chief of support services. He selected the two officers he felt would best be able to accomplish his goals as the law allows him the discretion to do. The plaintiffs were upset they were not selected, and now cry "reverse discrimination" because one of the officers chosen was black.

Jones never said he had a "plan." There was no set process for the selection of the deputy chief positions. (DSOF ¶ 13, 34, 41). According to Fee and Jones (and Illinois law), the decision is completely up to the chief of police to choose the person the *chief* believes is best suited for the position. (DSOF ¶ 5, 8, 13, 35). Peter Fee was the only police chief in the history of the department to have made selections for deputy chief before Gary Jones made his selections, so there was no longstanding precedent in place. (DSOF ¶ 12, 13).

While the defendants have never argued that they used race to correct racial imbalances as plaintiffs allege, it is not improper to take the reality of a situation into account when making a completely discretionary decision. When Jones said "Malcolm White's race was a consideration," but not the reason for his selection, he was merely acknowledging the fact that Malcolm White was African American. (DSOF ¶ 52). It was a fact he could not ignore. He had heard the comments of the community that there were no black supervisors. *Id.* He made clear, however, that his race was not the reason White was chosen. *Id.* More important, it was *not* the reason that the three remaining plaintiffs were *not* chosen.

  **2. Jones' Statement that he "considered" White's race in making his selection, does not convert his decision into an "affirmative action plan".**

The question of whether Gary Jones' statement, that race was a "consideration" but not a factor in his decision, constitutes an unlawful racial preference, is a question of law to be decided by the court. *Reynolds v. City of Chicago*, 296 F.3d 524 (7th Cir. 2002).

Jones testified:

"I knew that whatever decision I made, I would probably come under scrutiny by someone. I quickly learned that as Chief of Police that's part of the ball game. I quickly learned that whoever you choose, somebody is going to be left out, and they're not going to be happy.

But I had to make a decision. I had to make a decision for a Deputy Chief that I felt would be the best to carry out my mission, to carry out the mission of the Hazel Crest Police Department in some ways that I don't feel that it had been carried out before, and to best serve the people of the Village of Hazel Crest. I wanted it to be a better police department than it had been in the past, and those are all things that came in to play, and I felt that Malcolm White gave me the best opportunity to deliver those services in that fashion.

Q.   Did you consider race as a factor in making your decision to promote Malcolm White?

A.   *Malcolm White's race was a consideration, but it was not the reason.*

Q.   How was it a consideration?

A.   I knew very well that the people of Hazel Crest, I had heard it many times throughout my career, that the people of Hazel Crest scrutinized the Hazel Crest Police Department for their lack of minority representation in supervisory levels of the police department."  (Ex.___, Jones Dep., pp. 38-39;DSOF ¶ 52, 53). (Emphasis added.)

The fact that he was "glad" he had an opportunity to make a selection he believed in who was also African American and, therefore, increased the "diversity" at the supervisor level at the same time, does not mean that he intentionally discriminated against the plaintiffs.

The fact that the mayor felt that increasing diversity within the employment at the village was important and part of his campaign platform, was no secret. (DSAF ¶ 15).  Did that fact mean that Jones was *precluded* from choosing a black officer as deputy chief for fear of being charged with discrimination? The fact is Jones did not like the choices that any of the plaintiffs presented – for reasons having nothing to do with race.  (DSOF ¶ 67, 68, 74, 80, 81, 91).

D.    Qualifications.

Plaintiffs argue that they were all vastly more qualified to be deputy chief than Malcolm White. They cited their academic achievements. (At least Murray and Garofalo did. Peers, like White and Gentzle, did not have a bachelors degree, either. (DSOF ¶ 9)) They cited the

supervisory courses they had taken. (Of course, as sergeants, they each attended the supervisory courses *all* sergeants attend. Since his promotion, Malcolm White has now attended them as well. (DSAF ¶ 11)) In fact, the statute allowing for the appointment of officers of any rank to the position of deputy chief, specifically contemplated that those officers might not achieve a supervisory rank until after their selection for deputy chief. (DSOF ¶ 5, 8). It provides that they can take promotional exams without having to resign their position as deputy chief. (65 ILCS 5/10-2.1-4; (DSAF ¶ 12)).

The plaintiffs overlook the most important qualifications – those not found on paper. They completely ignore whether Jones could *trust* the officer chosen and whether he had faith they would help him achieve the goals the chief set for the department. The fact that some of the plaintiffs had a "college degree" has no bearing on the former and may have little to do with the latter. Each of the plaintiffs believed that the chief of police should look for someone he could place his trust and confidence in, and who is of good character when making his selection. (DSOF ¶ 61, 68; DSAF ¶ 19). As noted, Gary Gentzle, the other deputy chief selected, like Malcolm White, had no college degree and had not taken any college courses for a "good five or six years." (DSAF ¶ 13). None of the plaintiffs raise that fact when they argue they were better qualified than Malcolm White. Gentzle did not believe that the fact he did not have a bachelor's degree made him less qualified for the position. (DSAF ¶ 14).

**E.** **The plaintiffs equate a desire for a diverse supervisory rank of officers with "racial discrimination."**

The plaintiffs seem to equate a desire to have a "diverse" police force with racial discrimination in favor of blacks or other minorities. The *desire* to achieve diversity does not mean that any decision made, where a minority is selected, is a result of discrimination. Nor does it mean that because diversity is perceived as something good to strive for, that there is an illegal "plan" in place to achieve it.

**F.** **Qualified Immunity.**

The defendants are entitled to the protections of qualified immunity. The defendants dispute that Gary Jones' selection of Malcolm White as Deputy Chief of Police was based on his race. However, even if it was, Gary Jones was vested with the authority to select his deputy chief. Since it had not been clearly established that Gary Jones could not "consider" the fact that Malcolm White was black when making his selection, the individual defendants are protected by the doctrine of qualified immunity. *Pearson v. Callahan*, _____ U.S. ___, 129 S.Ct. 808, 821 (2009).

Qualified immunity provides governmental officials the freedom to perform the discretionary functions of their job without fear that they will be liable for civil damages. *Elwell v. Dobrucki*, 224 F.3d 638, 640 (7th Cir. 2000). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008). For purposes of qualified immunity, the issue is not whether Gary Jones' decision actually constituted an impermissible racial preference, but whether it was "clearly established" that selecting White for one of the two deputy chief positions was unlawful. *Elwell* at 640.

Here, while there was no "affirmative action plan" as argued by the plaintiffs, it would be silly to argue that Jones was not aware of the fact that the village was mostly black and that promoting White to deputy chief might help Jones govern more effectively within the community. What is not clear is whether taking these facts into consideration was unlawful or violated *the plaintiffs'* constitutional rights. In *Wittmer v. Peters*, 87 F.3d 916 (7th Cir. 1996), the court allowed race to be taken into account in a much more direct fashion than here.

In *Wittmer,* the court noted that there were enough Justices of the Supreme Court who rejected subjecting reverse discrimination in favor of a minority to strict scrutiny analysis "to create a majority of the Court in favor of permitting some reverse discrimination." *Id.* at 918, citing *Adarand Constructors, Inc. v Pena.* 115 S.Ct. 2097, 2117 (1995). "How *much* reverse discrimination is permitted is unclear." *Id.* (Emphasis in the original.) The court went on to note

that "[o]ther cases, moreover, single out the law-enforcement and correctional settings as the very *clearest* examples of cases in which departures from racial neutrality are permissible," making the point that "the rectification of past discrimination is not the only setting in which government officials can lawfully take race into account in making decisions." *Id.* at 919. (Emphasis in the original.)

In 2000, the court in *Elwell* upheld another decision in which race was explicitly taken into account in another prison promotion case. In *Elwell*, the Seventh Circuit said, "We are certainly not prepared to say that the state of law in 1992 was clearly established in the opposite direction, when we ourselves *continue* to uphold some hiring decisions that take race into account." *Id.* at 640. (Emphasis added.)

Given the uncertainty in the law in this particular type of situation, whether Gary Jones could take Malcolm White's race into "consideration" is far from clear and he should be afforded the protection of qualified immunity in making this single, discretionary decision.

### G.    No Involvement of Donaldson or Palmer

Plaintiffs have failed to present evidence of the involvement of either Robert Donaldson or Robert Palmer in Gary Jones' decision to appoint Malcolm White as deputy chief. While the plaintiffs theorize that Gary Jones felt he was under pressure to select a black officer due to his awareness that diversity was one of Robert Donaldson's campaign issues, there is no evidence that Mayor Donaldson in any way directed his choice. The fact that Jones was aware of Donaldson's desire for diversity, does not mean that Donaldson is liable for *Jones'* choice as it is beyond dispute that Donaldson had no authority to make the decision.

Likewise, there is no evidence that Robert Palmer had any involvement in the decision to select either of the officers for deputy chief. Why Robert Palmer is even named as a defendant is unclear given the complete lack of evidence as to his involvement. Accordingly, both Robert Donaldson and Robert Palmer are entitled to summary judgment. *See e.g. Eversole v. Steele*, 59

F.3d 710, 717 (7th Cir. 1995) (finding that the plaintiff must demonstrate that *each* individual defendant violated clearly established constitutional rights at the time they acted.

### H.     No support for *Monell* claim against the Village.

#### 1.     No "institutionalization" of any form of discrimination.

Desire for diversity does not equate to discrimination. When Jones made his decision, he did so based on who he felt would best be able to assist him as chief of police – not pursuant to any plan. (DSOF ¶ 34, 35, 41).  While the Equal Opportunity Action ("EOA") plan drafted by Chief Fee set out goals of achieving racial diversity, it did not mandate any unlawful process. (DSOF ¶ 15). Contrary to plaintiffs assertion, Jones never "admitted" he was acting pursuant to any policy when he made his decision. (Plaintiff's Murray and Garofalo Joint Mem. in Supp. of Summ. Judg., p. 16) The EOA did not mandate hiring or promoting employees on the basis of race.  *Id.*  In fact it is the same "plan" cited by plaintiffs earlier in their brief, that describes the "race neutral" process for hiring and promoting officers to increase the number of minority officers at the patrol and supervisory levels. (See, p. 13)(Pltf. Exh. 14, Fee's 12/13/04 Equal Opportunity Action Plan, Section IV, "Plan".) Clearly, it was an issue of concern for Chief Fee well before Mr. Donaldson was elected mayor and before Gary Jones was named chief of police.

#### 2.     Neither Jones, Palmer nor Donaldson were "final policy makers" for purposes of a Monell claim against the Village.

In order to make a *Monell* claim based on a "final policy maker" argument, there first must be an allegation. *McGreal v. Ostrov*, 368 F.3d 657, 685 (7th Cir. 2004). The plaintiffs never pled any facts in their complaint to establish "final policy making authority". Contrary to plaintiffs' assertion, the defendants never "conceded" that Jones was a final policy maker. (Plaintiff's Joint Memorandum, p. 17). The fact that Jones was authorized to choose his deputy chiefs, does not make him a "final policy maker" for *Monell* purposes and neither *Nebel* nor *Barth* nor *McGreal*, cited by the plaintiffs, support such a contention. In *Nebel*, the court denied

a motion to dismiss, stating that it was too early to determine whether the police chief had final policy making authority on the issue at hand as "conclusory allegations" are all that is needed to withstand a motion to dismiss. *Nebel* at *5. In *Barth* the defendants *conceded* that the police chief *did have* final policy making authority in their reply brief thereby making the subject moot. *Barth* at *25. There is no such concession here. In fact, as argued below, there has never been an allegation that Jones or Donaldson were final policy makers for *Monell* purposes.

In the Village's answer, village admitted that it was *not* its policy to discriminate. (DSAF ¶ 16). In *McGreal*, cited by plaintiffs, the city admitted the police chief was the final policy maker for the city. Even with such an admission, the court in *McGreal* found that there was a question of fact whether the chief of police actually had final policy making authority. *Id.* at 685. The fact, here, that the chief of police could select his deputy chiefs, does not vest him with "final policy making authority" for purposes of a *Monell* claim. The court in *McGreal* held that there must first be an allegation of final policy making authority before the court can go to the next step and determine whether the facts support the allegation made. *Id* at 685. In *McGreal*, the issue was moot because "the plaintiff not only alleged that one of the defendants was the final policymaker in regard to the act in question, but the defendants actually admitted that this was the case." *Id.*

The plaintiffs never took even the first step to assert a *Monell* claim – they never included an allegation supporting a *Monell* claim in their complaint.

I.    **For Plaintiffs to Prevail on their Motion for Summary Judgment, they would have to prove they were certain to have been selected for the deputy chief position absent discrimination.**

Even if one assumes, *arguendo*, that the selection of Malcolm White was made on the basis of improper racial discrimination, the plaintiffs could not prevail on their own motions for summary judgment, because they cannot establish that they were certain to have been selected instead. The simple fact that there are three (formerly four) plaintiffs vying for the position of deputy chief for which Malcolm White was selected, means that *none* was certain to have been

selected for the position. Because none can show that they would have been selected for the position *but for* discrimination, summary judgment could *never* be entered in their favor.

As this court noted in its December 7, 2006, Memorandum Opinion on defendant's motion to disqualify, it is a defense to the plaintiffs' Title VII failure to promote claim, "that a particular plaintiff would not have been promoted even if there had been no discrimination," (citing 42.U.S.C.§ 2000e-5(g)(2).) "The defense that another person would have instead been selected would also apply to any § 1983 discrimination claim that plaintiffs may ultimately be pursuing." Mem. Op. at p. 5, citing, *Bishop v. Gainer*, 272 F.3d 1009, 1016 (7th Cir. 2001). "The plaintiffs bear the burden of establishing their losses, and, in the case of promotional opportunities, it is the plaintiffs' burden to establish the probability that they would be promoted over *all* other potential candidates."*Alexander v. City of Milwaukee*, 474 F.3d 437, 451 (7th Cir. 2007). (Emphasis in the original.) This plaintiffs cannot do. For example, Paul Oldenburg (a white officer) was promoted to sergeant from the sergeant's eligibility list on July 13, 2005, while Gary Jones was chief of police. (DSAF ¶ 1) He was promoted to deputy chief of police by then-chief Elisha Ervin, upon the retirement of Deputy Chief Gary Gentzle, on April 24, 2007. (DSAF ¶ 2) (Notably, at the time of his promotion to deputy chief, Oldenburg also had less than two years experience as a sergeant.) The plaintiffs have not established that they would have been selected over Paul Oldenburg or any other eligible officer for deputy chief of police.

The plaintiffs have not presented evidence that they were better qualified than *any other* officer with five years or more experience on the department. Without such evidence, the plaintiffs cannot prevail on their motion for summary judgment.

## J.    Constructive Discharge

The facts cited by the plaintiffs do not support a claim for constructive discharge.

A claim for constructive discharge requires the Plaintiffs to prove more than insult, humiliation and embarrassment.  Instead, they must show that due to the alleged discrimination, their working conditions became so intolerable that a reasonable person would have been forced

into involuntarily resign. *Tutman v. WBBM-TV/CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir.2000); *Drake v. Minnesota Mining & Manuf. Co.*, 134 F.3d 878, 886 (7th Cir. 1998). The Seventh Circuit has further elaborated that the "[w]orking conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking redress." *Robinson v. Sappington*, 351 F.3d 317, 336 (7th Cir. 2003).

Here, the Plaintiffs have not established any conditions that give rise to the inference that their work environment was so intolerable that they were forced to resign. The only fact they cite is an alleged statement that Jones made during a staff meeting that "their careers were over." (PSAF ¶ 41 ) Jones denies he made this statement (Defs' Ex.___, Jones Dep., p. 334.) However, even according to the plaintiffs, the statement was made *while Peter Fee was still chief*, at Fee's last staff meeting. (Defs' Ex.___, Peers Dep., p. 87; Defs' Ex.___, Murray Dep. pp. 144, 161) In fact, the way Peers claims to have heard the statement, he said, "that our careers were over unless he's made chief." (Defs' Ex.___, Peers Dep. p. 87). So, while the plaintiffs try to twist the facts to support a "constructive discharge claim" it is clear that there are no real facts to support such a claim. After Gary Jones became chief, the only fact any of the plaintiffs cites is that Malcolm White allegedly referred to Michael Garofalo as a "fucking pussy." The hearsay statement was purportedly made to another officer. Garofalo never heard it directly and never confronted Malcolm White about the statement. (Defs' Ex.___, Garofalo Dep., p. 147)

Unlike the cases cited by the Plaintiffs, the Plaintiffs have not alleged that they were ever told that Gary Jones did not want them in the Hazel Crest Police Department, nor have they alleged that their job duties were whittled away. None were ever asked by Jones to leave. On the contrary, Plaintiff Murray alleges that he was given additional duties. The undisputed facts establish that he was promoted to Administrative Sergeant, reporting directly to the Chief of Police, in charge of accreditation. The Plaintiffs' allegations failed to establish working

conditions of the type necessary to succeed on a constructive discharge claim as a matter of law. *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 517 (7th Cir.1996).

## II.      Reply in Support of Motion to Dismiss Counts II through V.

### Introduction

The Plaintiffs filed claims under Title VII which are addressed in Defendants' motion for summary judgment.  Additionally, the Plaintiffs filed claims under Section 1983 for interference with their civil rights (Count II), claims under Section 1981 alleging interference with the Plaintiffs' contractual rights based on race (Count III), claims alleging conspiracy under Section 1985 (Count IV), and claims alleging breach of contract under state law (Count V).[2]  The Defendants' motion to dismiss addresses all of those additional claims in a combined brief with the Defendants' motion for summary judgment, as ordered by this Court on June 11, 2009.

### Argument

First, as stated in Defendants' motion to dismiss, the Plaintiffs were not deprived of a property interest.  Plaintiffs Murray, Peers and Garofalo either retired or resigned from their employment. The Plaintiffs did not allege a violation of the Equal Protection Clause, and instead framed their allegations to assert a violation of the Due Process Clause.  The Plaintiffs' Due Process Clause violation claims fail as a matter of law.  The Plaintiffs should not now be able to assert that their complaints alleged violations of the Equal Protection Clause after discovery has revealed that their Due Process Clause claims were not viable.  Alternatively, the Plaintiffs cannot succeed on a claim for constructive discharge since feelings of insult, humiliation or embarrassment are not sufficient to establish constructive discharge.  *See Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 877 (7th Cir. 2001).  Therefore, Defendants motion to dismiss Plaintiffs' claims under Section 1983 for interference with their civil rights should be granted.

---

[2]David Nelson voluntarily dismissed his complaint with prejudice and is no longer a party to this action.  See the Court Order, Doc. 77, entered Sept. 30, 2009.

Second, Plaintiffs claims alleging interference with their contractual rights based on their race fail as a matter of law. In the Seventh Circuit, Section 1981 claims are generally analyzed under the same framework as Title VII claims. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir.). Because a motion to dismiss can be treated as a motion for summary judgment according to Rule 12(d), the arguments raised in Defendants motion for summary judgment with respect to the Plaintiffs claims under Title VII are equally applicable to support Defendants' arguments that Plaintiff's Section 1981 claims fail as a matter of law. *See Bratton v. Roadway Package System, Inc.*, 77 F.3d 168, 176 (7th Cir. 1996); *Hefley v. Davis*, 2008 WL 5114647, *2 (N.D.Ill. 2008). Therefore, Defendants' motion to dismiss Plaintiffs' claims under Section 1981 should be granted with respect to all Defendants.

Third, Plaintiffs failed to raise any arguments with respect to Defendants' motion to dismiss their claims alleging conspiracy under Section 1985 (Count IV) and their claims alleging breach of contract under state law (Count V). Thus, any objection to dismissing those counts has been waived.

Finally, the individual defendants are protected from liability by the doctrine of qualified immunity. Plaintiffs are correct that the test to determine whether qualified immunity applies is whether a constitutional right was clearly established at the time taking into account the specific facts of this case. However, the Plaintiffs are incorrect that the right at issue here was clearly established. Rather, the Seventh Circuit has noted that "reverse discrimination is not illegal per se," but it has yet to be decided to what extent reverse discrimination is permissible. *Wittmer v. Peters*, 87 F.3d 916, 918 (7th Cir. 1996). Therefore, (while not conceding discrimination) since the extent of the constitutional right to be protected against reverse discrimination has not been clearly established, the individual defendants are entitled to qualified immunity and the Plaintiffs' claims against the individual defendants should be dismissed in their entirety.

### A. Pursuant to FRCP Rule 12(d), Defendant's Motion to Dismiss May Properly Be Treated As a Motion For Summary Judgment Under Rule 56.

The Plaintiffs have argued that the Defendants motion to dismiss fails to meet the requirements under Federal Rule of Civil Procedure 12(b)(6).  The Plaintiffs further argue that they merely have to "defend the sufficiency of their complaints."  (See Plaintiffs' Response, p. 6). However, the Plaintiffs arguments are misguided, as Federal Rule of Civil Procedure 12(d) applies in this instance, allowing matters outside the pleadings to be considered by the court in ruling on the Defendants' motion to dismiss.  F.R.C.P. 12(d) (2007).  Rule 12(d) provides: "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  *Id.*

In this case, the court has ordered the parties to address all issues in a single brief.  The facts elicited during discovery apply to all theories raised by the Plaintiffs.  It would be a monumental exercise of form over substance not to address the merits of the theories the Plaintiffs have re-raised after discovery closed, as they suggest.

Therefore, the standard under Federal Rule of Civil Procedure 56 governs the Defendants' motion to dismiss, and the court need not ignore facts that arose during discovery. Pursuant to Rule 56, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Here, the Plaintiffs claims in Counts II through Counts V fail as a matter of law.  Therefore, Defendants motion to dismiss should be granted under Rule 12(d) and Rule 56.

**B.**     **Count II of Plaintiffs' Complaint Fails As a Matter of Law Because Plaintiffs Have Failed to Allege the Deprivation of a Property Interest.**

As argued above, the Plaintiffs arguments that reliance on facts outside the pleadings is inappropriate is incorrect pursuant to Rule 12(d).  Instead, the Defendant's Motion to Dismiss

can be ruled on as a motion for summary judgment and pursuant to Rule 56, discovery may be considered.

**1. Plaintiffs Alleged Only Violations of the Due Process Clause and Should Not Now Be Entitled to Change Their Theory of Recovery.**

The Plaintiffs' complaint is clearly framed to give rise to the inference that they assert that their constitutional rights were violated under the Due Process Clause. The Plaintiffs' allegations repeatedly make reference to deprivations of their property rights, property interests and continued employment. For example, in Plaintiff Murray's complaint, he alleges:

> 91. Illinois law provided Murray with a ***property interest*** in his employment by the Hazel Crest Police Department.
>
> 92. Thus, Murray had a ***property interest in his continued employment*** with the Hazel Crest Police Department.
>
> 93. The Fourteenth Amendment protects Murray's ***right to be free of deprivation of this property right*** because of his race, Caucasian.
>
> 94. Acting under color of law, Defendants, by using the powers of their offices, ***intentionally deprived Murray of his property interest*** in his employment in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment.

(Murray Complaint at Law, par. 91-96) (emphasis added). However, the Plaintiffs now assert that their allegations under Section 1983 were allegations that the Defendants violated their rights to equal protection. Although Rule 12(d) allows this Court to consider matters outside the pleadings, the Plaintiffs should not be permitted to transform their complaints alleging due process-type violations and constructive discharge in an attempt to survive Defendants' Motion to Dismiss.

**B. Plaintiffs Due Process Claims Under Section 1983 Fail As a Matter of Law**.

**1. Plaintiffs Failed to Allege a Claim For Municipal Liability Under the Standard Required By Monell.**

To succeed on their claims of municipal liability against the Village of Hazel Crest, the Plaintiffs "must allege a specific pattern or series of incidents that support the general allegation

of a custom or policy." *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1237 (7th Cir. 1986) *quoted in Allen v. Chicago Transit Authority*, 2000 WL 1038134, 5 (N.D.Ill. 2000). The Seventh Circuit has continuously held that it is far from sufficient to merely allege "boilerplate allegations of a municipal policy entirely lacking in any factual support that a policy exists." *Sivard v. Pulaski County*, 17 F.3d 185, 188 (7th Cir. 1994) quoted in *Allen*, 2000 WL 10381354 at 5. Here, Plaintiffs' complaints fail to allege a custom or policy at all. *McGreal*, 368 F.3d at 685.

Belatedly, the Plaintiffs now attempt to argue that the Village of Hazel Crest's Equal Opportunity Action Plan ("EOA Plan") was an official policy that "stipulated that the supervisory staff of the police department was to reflect the racial makeup of the community." However, the EOA Plan by its terms contained no such stipulation. Rather, the EOA Plan explicitly states that "[i]t is the policy of the Hazel Crest Police Department to actively support equal opportunity by establishing programs with goals and objectives designed to enhance a non-discriminatory environment and to ensure equal opportunity exists for all employees regardless of race . . ." (See Exh. P to Defs' Mot. for Summ. Judg./Mot. to Dismiss). Any mention of the Police Department's staff in any way reflecting the racial makeup of the Village of Hazel Crest is set forth under the section of the EOA Plan clearly delineated as "Goals and Objectives." A goal such as that is not tantamount to a custom or policy sufficient to trigger municipal liability under Section 1983. Because the Plaintiffs argue nothing more, the Defendants are entitled to the granting of their Motion to Dismiss with regard to Plaintiffs' claims of municipal liability. (See also, Sec. I., H., 2, pp. 18-19, supra.)

### 2. Plaintiffs Failed to State a Claim For Constructive Discharge.

[See, Sec. I., J, pp. 21-22, supra.] Defendants motion to dismiss with respect to the Plaintiffs claims under Section 1983 should be granted because the Plaintiffs have failed to state claims upon which relief may be granted.

### C. Any Claim For Equal Protection Claim Would Fail as Well.

Even if one considered the plaintiffs' claims as Equal Protection claims, they would still fail. While "the Equal Protection Clause is implicated when the government makes class-based decision in the employment context, treating distinct groups of individuals categorically differently," *Engquist v. Oregon Department of Agriculture*, ___ U.S. ___, 128 S.Ct. 2146, 2155 (2008), the Supreme Court has "never found the Equal Protection Clause implicated in the specific circumstance where, as here, government employers are alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner." *Id.* The kind of personalized, individual, discretionary decision that Gary Jones had to make in trying to select the two officers who, in his view, would best serve as his deputy chiefs of police, is exactly the kind of personnel decision the Supreme Court addressed in *Engquist* and which it explicitly says, does not implicate the Equal Protection Clause.

> "Indeed, recognizing the sort of claim Engquist presses could jeopardize the delicate balance governments have struck between the rights of public employees and "the government's legitimate purpose in 'promot[ing] efficiency and integrity in the discharge of official duties, and [in] maintain[ing] proper discipline in the public service.' " . . . Were we to find that the Equal Protection Clause subjects the Government to equal protection review for every allegedly arbitrary employment action, we will have undone Congress's (and the States') careful work.
>
> ***
>
> "[A]ny personnel action in which a wronged employee can conjure up a claim of differential treatment will suddenly become the basis for a federal constitutional claim. Indeed, an allegation of arbitrary differential treatment could be made in nearly every instance of an assertedly wrongful employment action-not only hiring and firing decisions, but any personnel action, such as promotion, salary, or work assignments-on the theory that other employees were not treated wrongfully. *See* 478 F.3d, at 995. On Engquist's view, every one of these employment decisions by a government employer would become the basis for an equal protection complaint." *Id.* at 2156 (Citations omitted; alterations in the original).

Accordingly, however the plaintiffs' 14th Amendment claims are characterized, they fail under the facts of this case.

### D. Plaintiffs Did Not Have a Contractual Right to Promotion to Deputy Chief.

Plaintiffs' §1981 claim is characterized as intentional interference with plaintiff's contractual relationship of employment on the basis of his race. The Plaintiffs allege that they were entitled to promotion to deputy chief by virtue of their employment contracts. For example, Murray alleges that "[b]y refusing to promote Murray . . . Defendants intentionally interfered with Plaintiff's contractual relationship of employment." (See Murray Complaint, par. 93). The Plaintiffs further allege that they were entitled to the right of continued employment and the Defendants interfered with their contractual relationships by forcing them to resign. (See e.g. Murray Complaint, par. 94, 95).

The Seventh Circuit has generally applied the same prima facie requirements to discrimination claims brought under Title VII and Section 1981. *Humphries*, 474 F.3d 404. Because the methods of proof and elements of the case are essentially identical, and because the Plaintiffs Title VII claims fail, as discussed extensively in Defendants' motion for summary judgment, the Plaintiffs cannot succeed on their Section 1981 claims. Plaintiffs had no contractual right to promotion to deputy chief. Likewise, the fact that they quit after not receiving the promotion, does not support a claim for constructive discharge as they seem to allege. The arguments overlap with the arguments made with respect to Title VII and will not be repeated here. [See Sec. I., A., B., C., D., pp. 3-15 above.]

**D.      Plaintiffs Have Waived Any Objection to the Dismissal of All Claims Made Under Section 1985 and State Law Theories of Breach of Contract By Virtue of Their Failure to Address Defendants' Motion to Dismiss Those Counts.**

The Plaintiffs have not raised any arguments in response to the dismissal of their claims alleging conspiracy under Section 1985. Additionally, the Plaintiffs have failed to raise any arguments in response to the dismissal of their claims under state law theories of breach of contract. Because the conspiracy claims fail as a matter of law by virtue of the intracorporate conspiracy doctrine, the Defendants motion to dismiss those counts should be granted.

**E.      All Non-Title VII Counts Against the Individual Defendants Require Dismissal Because Those Defendants Are Entitled To Qualified Immunity.**

[See, Sec. I., F., pp. 16-17, "Qualified Immunity" above.]

**F.     Plaintiffs Should N ot Be Permitted to Amend Their Complaints With Respect to Count II and/or III At This Stage of the Proceedings.**

The Plaintiffs have requested that they be allowed to amend their complaints in the event this Court dismisses Count II and/or Count III of the Plaintiffs' complaints.  The Plaintiffs are not entitled to amendment in that event because Rule 12(d) allows the motion to dismiss to be treated as a motion for summary judgment under Rule 56.  Because amendment is not allowed after summary judgment, it would be an improper procedure after ruling on Defendants' motion to dismiss in this case and should not be available to the Plaintiffs.  Additionally, allowing Plaintiffs to amend their complaints at this stage of the proceedings, after discovery has been completed, would allow them another bite of the apple by allowing them to conform their allegations to the precise facts which arose in the discovery process.  That would not only be extremely prejudicial to the Defendants, but would also trigger a waste of time and further resources after initiating the pleading process once again.

## Conclusion

For all of the reasons set forth above, the defendants ask that the court grant their motion to dismiss and/or grant their motion for summary judgment on all counts and further that the court deny the plaintiffs' motions for summary judgment.

Respectfully Submitted,

By:_____/s/ Thomas R. Weiler_____
                One of the Attorneys for Defendants

Thomas R. Weiler
Attorney for the Defendants, Village of Hazel Crest, Robert B. Donaldson, Gary A. Jones and Robert L. Palmer

Langhenry, Gillen, Lundquist & Johnson, LLC

33 North Dearborn Street - Suite 1650

Chicago, IL 60602

Tel: (312) 704-6700

Atty No. 06184955